## Kentucky Title Company v. Hail.

(Decided March 25, 1927.)

### Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Insurance.—Petition, in action on title insurance contract held not demurrable for failure to allege that plaintiff had been evicted, notwithstanding provision of contract.

2. Insurance.—The rule requiring an eviction as a condition precedent to right to maintain action on title insurance contract or warranty of title, has no application to a case where possession has not been and cannot be acquired by the insured or grantee.

3. Insurance.—In action on title insurance contract, where defendant admitted that it discovered misdescription in deed which included land already sold and that through mistake it carried such misdescription into insurance contract, it could not defend on ground that, under contract, it was not liable for deficiency, in absence of surface survey.

4. Insurance.—Title insurance company held not entitled to reformation of contract to make it correctly describe property, where it admitted that misdescription was discovered before execution of contract and carried into contract by mistake of its own employees, without any fraud or knowledge thereof on part of insured.

5. Reformation of Instruments.—Power of a court of equity to reform a contract ought not to be exercised except in a clear case and upon strong and convincing evidence.

6. Reformation of Instruments.—A unilateral mistake is not ground for reformation of contract, hence instrument which agrees with the intention of one party, though executed under mistake by the other, cannot be reformed.

7. Reformation of Instruments.—Before equity will reform a written instrument, it must appear that there was a valid agreement, that the instrument failed to express it, that failure was due to mistake, and this by clear and convincing proof.

8. Reformation of Instruments.—To warrant reformation of instrument, where mistake is unilateral, fraud must be alleged and proved.

9. Contracts.—It is well settled that all prior negotiations are merged in a written contract.

10. Insurance.—Plaintiff, in action on title insurance contract seeking recovery for deficiency, held entitled to recover proportionate part of present value of land rather than proportionate part only of the price which he paid for it.

OSCAR BADER for appellant.

BOOTH & CONNOR for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming in part and reversing in part.

The appellee, Hail, began this action against the appellant, Kentucky Title Company, in an effort to recover $1,779, which, Hail alleged, was due him from the title company upon a title insurance contract, which he filed with his petition. Hail recovered $1,014.54, and from that judgment the title company has appealed, and Hail has prosecuted a cross-appeal. This was begun as an action at law. The title company demurred to the plaintiff's petition, and, when the demurrer was overruled, it then filed an answer and upon its motion the case was transferred to equity. The defenses set out in the answer are these: First, that the description of the property written in the insurance contract was erroneous and was inserted in this contract by the mutual mistake of Hail and the title company, and upon this ground the title company asked, by way of counterclaim, for a reformation of the insurance contract and tendered a new insurance contract executed by it, containing a true description of the property, which it asked that Hail be required to accept in lieu of the insurance contract sued on. Second, that the loss suffered by Hail is a loss resulting from a deficiency in the land, which is expressly excepted from the policy. Third, that if plaintiff is entitled to recover at all, he is entitled to recover a proportionate part not of the present value of the land, but only of the price which he paid for it.

With one exception there is little controversy as to the pertinent facts in the case. On September 22, 1923, Hail contracted with one Rasmussen to purchase two adjoining tracts of land owned by Rasmussen and located in Jefferson county. Two days thereafter, Hail made an application to the title company to make an examination of the proposed title and to write him a contract of title insurance thereon, of which application this is a copy:

Application for Insurance of Title.

"Louisville, Ky., Sept. 24, 1923.

"The undersigned hereby applies to the Kentucky Title Company for a policy of insurance, in its usual form, in the sum of $————, which is the true consideration for the interest to be insured, on the title to the premises hereinafter described, hereby covenanting that the following statements are true and correct to the best of the applicant's knowledge and belief, and that if before the delivery of the policy to be based hereon he should have further information or any intimation as to any defect of title, objection, lien or incumbrance, affecting said premises or any part thereof, he will at once make the same known to this company. Applicant further agrees that any untrue statements herein, or any suppression of material information, or any failure to communicate any such information or intimation shall avoid the said policy.

"Description of premises: 390, more or less, by 200 feet, more or less, and 35-foot lot. Property in D. B. 916x369, except part sold.

"Person to whom policy is to be issued: E. A. Hail.

"Interest to be insured: Fee simple.

"Present property owner: Anders Rasmussen.

"How title of present owner acquired: By deed.

"Person in possession of property: Tenant.

"By what title is such possession held? Lease.

"Are there any unpaid taxes or assessments, mortgages, liens or other incumbrances on the property? Don't know.

"If any, which are to remain? 1924 taxes.

"Does any other property drain over or under the property described herein? Don't know.

"Does any person other than the present owner use or claim any right to use any portion of the premises for any purpose? Don't know.

"Are there any buildings or repairs now being made or any other work now being done on the premises? None.

"Do you know, or have you heard of any objection to the title? No.

"By whom, and for whom was the title last examined? Don't know.

"Are there any unrecorded deeds or agreements, or any adverse claims or interests, or any. secret trusts, known or rumored to exist? Don't know.

"Shall a survey of the property be made? It is understood that unless a survey is ordered the company will not be responsible for. adverse possession of any part of the premises by others than the present owner, or for any deficiency of land or for any easements or licenses therein not disclosed by the records affecting the title. The fee charged for the survey is in addition to the fee charged for the policy. No. Charge $——.

"It is understood that where the title is insured any delay or expense in obtaining actual possession of the premises is to be borne wholly by the insured and not by this company.

"Applicant hereby agrees to pay the company for such policy $67.00, and if the company declines to insure the title as herein applied for, to pay for its time and expense in the investigation of the title, ¾ above, provided, however, that notwithstanding the rejection for insurance, if applicant shall accept the title or shall receive a complete written statement of its condition, applicant agrees to pay the full fee first named in this clause. It is understood that any investigation made under this application is made for the company's information, and not as agent for the applicant.

"How is consideration to be paid? If already paid, how was it paid? Cash—Val. Cons.

" (Signed)   E. A. Hail.

"Witness.——.

"No. 57457.              Address 209 S. 8th St.

"Condensed Statement of Rates for Title Insurance in Louisville or Jefferson County.

"Basis for Charges.

"For owner's policies the full value as indicated by the bona fide purchase price, or where the applicant is already the owner, the assessed value.

"Where property is exchanged, a difference in money value being paid, the value of the larger property will be the assessed value of the smaller and the money difference. Value of smaller piece, assessed value.

"In even exchanges assessed value of either piece.

"City assessments must be used in all cases except where land is outside city limits.

"For mortgagee's policies the basis will be the amount of the mortgage.

"Rates for Original Insurance.

Where value is $500.00 or less ................................ $20.00
For each additional $100.00 up to $2,000.00 ...      1.00
For each additional $1,000.00 up to $30,000.00      5.00
For each additional $1,000.00 up to $100,000.00     4.00
For each additional $1,000.00 over $100,000.00      3.00

"Rates for Reinsurance.

"When vendor in voluntary sale surrenders policy insuring title in him, credits as follows allowed, viz.:

"First. No policy issued for less than $10.00.

"Second. If new insurance is not less than amount of old policy, and such old policy insures title as of a date more than 10 years before the date of application, then from above rates for original insurance deduct one-half of the charge for such old insurance at said rate. If old policy insures as of date more than three and less than ten years before date of application, deduct two-thirds of such charge. If old policy insures as of date less than three years before application, deduct three-fourths of such charge.

"Third. If new insurance is less than amount outstanding, deduct for the new the above proportions from above current rates."

No one claims that the description contained in this application is an accurate description of the property.

There were two adjoining pieces of this property.   One was approximately 200 feet wide and approximately 390 feet long.   The other was an irregularly shaped piece of property that fronted 35 feet on Hite avenue, and which was all the frontage left of this piece of property after a lot had been sold off of it to Jessie A. Lindsay. The reference to Deed Book 916, page 369, was not a reference to the source of the title, but was a reference to a deed of release discharging a lien upon the property.   Hail did not know anything about these figures at all, and said he did not remember seeing them in the application when he signed it.   All Hail did to this application was sign it.   The blanks in this application were filled in by Mr. John H. Stockoff, vice president of the title company. In his testimony, Mr. Stockoff was unable to say whether this matter had been written in this application before Hail signed it or not.   We notice a difference in the color of the ink in which several parts of the application were written, and this induces us to think that the truth of the matter is that Hail signed this application in blank, telling the title company what property he was buying; the title company then from its own records, drawings, investigations, etc., filled in the descriptions, made its examination of this title, and some days later advised Hail that it was prepared to report on the title.   Hail went to the title company's office where he was shown a small map indicating the location of the property and certain exceptions concerning some roadways and their outlets, and was advised about covenants for the improvements of roadways, which were explained to him, to which exceptions he agreed in writing.   A few days later, a deed executed by Rasmussen and wife to Hail was by Rasmussen tendered to the title company.   It compared this deed and the description in it with the report of its title examiners, and discovered that the description contained in the deed did not correspond with the description of this property which the title company's examiners had prepared.   The description in the deed from Rasmussen to Hail included a strip of ground 59 feet 3 inches wide, and about 201 feet 6 inches deep, which the title company's examiners had discovered did not belong to Rasmussen, and which, at the time Rasmussen bought, had previously been conveyed to Louis Zapp.   Hail was not present at this time, and Mr. Ruthenburg, the attorney representing Rasmussen, and Mr. Gohmann, the attorney representing the title company, discussed this dis-

crepancy, and they agreed that it would not be necessary to get a new deed, as this deed covered all the property that Rasmussen had there, and accordingly the deed tendered was, with the erroneous description in it and all other papers relative to the title, turned over to the title examiners of the title company to prepare the contract of title insurance.

The title company in preparing the policy, instead of using the correct description which it had discovered in its examination of the title, used the erroneous description contained in the deed, and the title insurance contract containing this erroneous description was then signed and delivered by the title company's officers to Hail. Thus at the time this contract was written, the title company knew that the description contained in the contract and contained in the deed included this strip 59¼ feet wide and about 200 feet deep, which was owned by Zapp. Hail did not know this. There is nothing in the record to show that he then had any information that the description in his deed and in his contract of title insurance was incorrect. The title company's attorney, Gohmann, claims this was explained to Hail, and that Ruthenburg, the attorney for Rasmussen, was present. Hail says no such explanation was ever made him, and Ruthenburg says Hail was not present at the time Gohmann called attention to the error that had been discovered. Ruthenburg says Hail was present when the deal was closed and the check for the purchase price was given, but he is not sure that any explanation was then made to Hail, but he thinks there was. Hail says no such explanation was then or ever made to him, and that when he was subdividing this property some months later, he learned for the first time of the error in the deed and in the title insurance contract, and then made demand of the title company to make good the loss he had suffered. The title company, which had, as we have stated, discovered this error, and had known all along that the error was carried into the deed, then learned that it had also carried this error into the contract of title insurance and thereupon it wrote to Hail, requesting him to bring in his title insurance contract in order that the correct description of the property might be inserted in it. It wrote Hail two letters about this, but in neither letter did it say anything to him about having explained to him before the policy was issued that the deed from the Ras-

mussens to him contained an erroneous description. The witness Hall, whom Hail had employed to subdivide this property, testified that, when he told Hail that he had found that 59¼ feet of the property included in the deed to Hail from Rasmussen belonged to Louis Zapp, Hail seemed much surprised.

In its examination of this title, the title company prepared two papers. One was printed on blue paper and is referred to as the "blue sheet," and the other is printed on yellow paper and is referred to as the "yellow sheet." There is a notation on the yellow sheet that the description in the caption was explained to Hail, and that Hail was advised to have a new deed written, but that he and Rasmussen preferred to use the one which Rasmussen and his wife had acknowledged. There is no evidence when or by whom this notation was made. There is no evidence that Hail ever saw this yellow sheet. His attention was called to the blue sheet and to the irregularities noted on that, and he agreed to accept the title with those irregularities upon it, and signed a memorandum on it to that effect. From this, we are persuaded that the notation on the yellow sheet was never shown to Hail, if indeed it had been written there at that time, because it is not believable that the title company would take such meticulous care to have Hail sign the exceptions noted on the blue sheet and not have him sign the notation on the yellow sheet, if it was there at that time. Another suspicious thing about this notation on the yellow sheet is that it is the last thing appearing upon the sheet, and above it, under the heading of "miscellaneous," we find this memorandum:

"Brought down to deed. L. Watson."

Beneath that, in a different handwriting, we find this memorandum:

"Deed to E. A. Hail, lodged 10/18/23."

Following that is an illegible signature. It would appear to us, that was the close of the matter, and when we find written below it this unexplained and unsigned memorandum about this error having been explained to Hail, it does not impress us.

The first contention of the title company is that the demurrer, filed by it to the petition, should have been sustained. This contract consists of pages 1 to 4, exclusive

of the cover. The first page, which was the page signed by the officers of the title company, is essentially this:

"The Kentucky Title Company hereby insures E. A. Hail against loss or damage not exceeding $8,000.00, which he shall sustain by reason of defects in or unmarketability of his title to the estate or interest described in schedule A, excepting defects, liens, etc., mentioned in schedule B, the loss and the amount to be ascertained in the manner provided in the annexed conditions."

Pages 2 and 2½ of this title insurance contract contained this schedule A, which is this erroneous description and certain road and passway exceptions. This is copied from schedule B, on page 3, of this contract:

"This policy does not insure against such estates, interests, defects, objections to titles, liens, charges, and incumbrances as are set forth below in this schedule, namely: (1) Tenancy of present occupant or occupants. (2) Adverse possession of others than the insured of the premises described in schedule A hereof, or any part thereof, deficiency of land, or easement or licenses affecting said premises, not disclosed by the records or discoverable by ordinary surface survey, and not against such as are so discoverable unless such survey is specially made, and a plat thereof attached hereto, showing no such adverse possession, deficiency, easements, or licenses."

In this schedule B there are noted, under exceptions 3, 4, 5, 6, 7, 8, and 9, certain other matters which do not affect this litigation, and therefore they are not copied. Page 4 of this title insurance contract sets forth a number of printed conditions on which this policy is issued. We shall quote from and discuss some of these later.

The title company contends Hail's petition was demurrable, and that, before he could maintain his suit against it, it was necessary for him to have instituted an action against Anders Rasmussen and Zapp, and to have some court determine whether or not he (Hail) was entitled to receive the land which he did not receive, and to attempt to recover this land or its value from Zapp or Rasmussen. This contention is based on this provision

copied from the fourth page of the contract of title insurance:

"No claims shall arise under this policy except where there has been a final judgment in a court of competent jurisdiction, under which the insured may be dispossessed or evicted from the premises covered by this policy or some part thereof."

Its position is not well taken, for in Bliss on Code Pleadings, 202, we find:

"When the exception is embodied in the body of the clause, he who pleads the clause ought to plead the exception, but when there is a clause for the benefit of the pleader and afterwards follows a proviso which is against him, he shall plead the clause and leave it to his adversary to show the proviso."

This practice has been approved in Bush v. Wathen, 104 Ky. 548, 47 S. W. 599, 20 Ky. Law Rep. 731; Marshall v. Tully, 193 Ky. 246, 235 S. W. 726; Travelers' Ins. Co. v. Henderson Cotton Mills, 120 Ky. 218, 85 S. W. 1090, 27 Ky. Law Rep. 653, 117 Am. St. Rep. 585, 9 Ann. Cas. 162; Philadelphia Life Ins. Co. v. Farnsley's Adm'r, 162 Ky. 27, 171 S. W. 1004.

There is no useful purpose that would be served by the institution of a suit against either Zapp or Rasmussen, the result of which any one can foresee. It is one of the maxims of the law, "*Lex neminem cogit ad vana seu inutilia.*" That is, the law will not force any one to do a vain and useless thing. That maxim applies here. One of the conditions of the policy is, in substance, that no claim shall arise under it unless the insured has actually been evicted. If Hail had ever been in possession of this entire tract, the title company's position would be well taken. However, the rule requiring an eviction as a condition precedent to maintaining a suit on a title insurance contract or warranty of title has no application to a case where possession has never been, and cannot be acquired by the insured or grantee.

In the case of Foxwell v. Justice, 191 Ky. 749, 231 S. W. 509, we said this and supported it by the citation of many authorities:

"An exception to the general rule that a cause of action on a warranty does not accrue until there has been an eviction is recognized in favor of one

who did not and could not acquire possession under his deed.''

In Place v. St. Paul Title Ins. & Trust Co., 67 Minn. 126, 69 N. W. 706, 64 Am. St. Rep. 404, we find practically this same contention made, and the ruling in that case was adverse to the contention of the title company. The title company has cited a great many cases from foreign jurisdictions that sustain its position, but we do not know just what are the provisions of the title insurance contracts in controversy in those cases. The provisions of those contracts may be quite different from the provisions of the contract before us. The facts appear to be different, and it is possible that the rules of pleading in foreign jurisdictions differ from those in this state. In this jurisdiction, it is well settled that, if a defendant desires to take advantage of such a condition, he should plead the condition. The demurrer to the petition was properly overruled.

The title company in its amended answer pleaded schedule B, which we have copied above, pleaded that Hail did not have a surface survey made of the property, that its contract did not cover a deficiency in the land that would be discovered by a surface survey, that this deficiency would have been so discovered, and it relies upon the provision of schedule B, exempting it from liability for a deficiency unless a survey was made, which provision was copied above. The title company overlooks the fact that the above application evidences two contracts which were made between it and Hail. One was a contract to investigate this title, and insure it, if insurable, for which Hail has paid it $67.00. The other contract was to investigate the title, and, if it was found uninsurable, Hail was then to pay it three-fourths of $67.00. The title company did investigate this title and did find this error, without a surface survey being made, and what we have said above about the law not compelling one to do a vain and useless thing applies here. Why should Hail have a surface survey made when the title company under its employment to investigate this title, without the survey, discovered the error and all that a surface survey could have possibly disclosed.

We come now to the counterclaim made by the title company in its answer, in which it asks to have this contract reformed, to have the insurance contract sued on canceled, and to substitute for it another title insurance

contract identical with the first one, except that the one now tendered contains a true description of the property, whereas the contract sued on contained an erroneous description. Of course, if this contract can be reformed, then Hail has no claim against the title company at all. It was in the hope of getting this reformation that the title company asked to have this case transferred to equity. In the recent case of Lossie v. Central Trust Co. of Owensboro, 219 Ky. 1, 292 S. W. 338, we said this, and supported it by the citation of many authorities:

> "The cancellation of an executed contract is the exertion of the most extraordinary power of a court of equity, which ought not to be exercised, except in a clear case and on strong and convincing evidence."

This same rule applies to the reformation of a contract. This policy was issued by the title company after an examination of this title made by its own experts, after that examination had passed the scrutiny of its own counsel, was written in the privacy of its own offices, when neither Hail nor any representative of his was present, and the first Hail knew of it or its terms was when he received it through the mail. A mistake was made. That is true, but it was entirely the mistake of the title company. Hail knew nothing of this mistake until the following year when the error was discovered, and he made demand of the title company for payment. There is no allegation of any fraud on the part of Hail, nor even an intimation. On the contrary, these were the facts: Hail had bought a piece of property. According to the description in the deed, he was getting property of certain definite dimensions. He wished to know that the title to what he was buying was good. Therefore he sought out the title company, and engaged its services to ascertain if that was true, and paid to it an agreed consideration, for which the title company undertook, by the contract sued on, to protect him against loss by reason of any defect or unmarketability in his title. It now turns out that instead of acquiring title to a piece of property of those certain dimensions, he only has title to a portion of that property, and Hail now has found out that some one else has title to a part of the property that was embraced in the description contained in his deed and contained in this title insurance contract. He never learned of this before, but

the title company did, and, in spite of the fact that it had learned of it, issued this contract of title insurance, using therein this erroneous description. The examination of titles was no part of Hail's usual occupation. It was the professed business of the title company. Because Hail felt that the title company was better prepared than he to examine this title, he secured its services. There has now happened to him the very thing that he was seeking to avoid; that is, he has bought and paid for a piece of property and is unable to get all the property that he bought. Thus he must lose a part of what he thought and had a right to think he was getting. This is the very thing which the title company by this contract guaranteed him would not happen. Of course, it now says that it made a mistake in making this guarantee, but there is no evidence that Hail made any mistake.

A unilateral mistake is not ground for reformation. An instrument which agrees with the intention of one party, although executed under mistake as to the other, cannot be reformed. Before a court of equity will reform a written instrument it must appear that there was a valid agreement, that the written instrument failed to express such agreement, that this failure was due to mistake, and this must all appear by clear and convincing proof. See Morris v. Gilliam, 213 Ky. 763, 281 S. W. 1026; M. P. Brothers Co. v. Kirkpatrick, 214 Ky. 560, 283 S. W. 424; Bass v. Hieatt Bros., 215 Ky. 313, 284 S. W. 1076.

The title company in its answer admits that the execution of this policy resulted from the carelessness and mistake of one of its employees. Of course, if there had been any allegation of fraud on the part of Hail, the court could have reformed or cancelled this contract, even though there had been a mistake on the part of the title company only, but fraud was not even intimated, and it is necessary to allege and prove it where the mistake is unilateral. See Gregory v. Copeland, 107 S. W. 768, 32 Ky. Law Rep. 1153; Dean v. Hall, 105 S. W. 98, 31 Ky. Law Rep. 1306. Having failed to show fraud and having admitted that it made the only mistake that was made, it follows that the title company's claim for reformation was properly dismissed, for it would be a monstrous thing if the court should permit an insurance company to escape its obligation on the theory that it had made a mistake in carelessly doing just what it was hired to do

and had contracted to do, and to permit it to impose on the insured, who paid it for insurance, the burden of bearing the result of that mistake. It appears that Hail knew the physical boundaries of the Rasmussen property. He frankly admits that, but he did not know the number of feet within those boundaries, except what he learned from the deed under which Rasmussen held it and from the description in the deed by which Rasmussen conveyed it to him. He was buying this property for the purpose of subdividing it and selling it for building lots, and used the information which he obtained from this deed for the purpose of calculating just how this property could be divided, and how many lots he could get out of it. He naturally supposed that the area within these physical boundaries was the same as the area described in his deed and in his contract of insurance. If the physical area of this property had been the same as the area described in his deed and in his title insurance contract, he could have got a certain number of lots out of it. He took that into consideration, of course, when he bought the property. That was one of the things about which he wanted to be assured. That was one of the things of which this title insurance contract assured him. He did not know that this was not true, but the title company did know it, and, having executed this contract in spite of that knowledge, it cannot now avoid its liability or ask that the contract be reformed. To a layman, the examination of a title is mysterious and the various pitfalls that may beset his title are dreaded, but unknown. To avoid a possible claim against him, to obviate the need and expense of professional advice, the uncertainty that sometimes results, and the uneasiness that is experienced even after it has been obtained, is the very purpose for which the owner seeks title insurance. The title company argues that Hail has got title to practically as much property as was described in the application, but while this property is described in the application as 390 x 200 feet, yet there is also contained in that application a reference to Deed Book 916, page 369, and in the record thus referred to there is the identical description contained in the deed made Hail by Rasmussen and used in the title insurance contract sued on.

Besides, there is nothing better settled than this, that all prior negotiations are merged in the written contract that is finally made between the parties, and this

written contract of title insurance, finally entered into,
guaranteed to Hail title to more property than he actually
got. The title company, as we have stated, had three de-
fenses. The trial court found against it on its first two
defenses, but accepted its construction of the contract as
to the third defense, and only required it to pay as the
loss under this contract that proportionate part of the
purchase price, which represented the property included
in the description written into this title insurance con-
tract, but which actually belonged to Zapp. We find
ourselves unable to agree with the learned trial judge in
his construition of this contract. The title company in-
sured Hail against loss or damage by reason of defects
in the title, and to us it appears that the reasonable con-
struction of that contract is that the title company must
do just what it contracted to do. It must make good to
Hail the loss or damage he has sustained, and to us it
seems that must mean not what he paid for the property,
but what he could have sold it for. This property cost
him something like $9.00 a front foot. He sold it for
$15.00 a front foot, and some of it for more, and, since
he did not get the property that was in the possession of
Zapp, he could not sell it, and his loss was not what he
was paying for the property, but what he was unable to
get because he could not sell that property. We find this
on page 4 of this policy:

> "In no case shall any loss be payable unless the
> insured shall consent to convey the insured estate to
> a purchaser named by this company, at the price at
> which the insured shall have contracted to sell it (if
> such contract shall have been made), or at the option
> of this company, at a valuation of the insured estate
> or interest to be made by three arbitrators, or any
> two of them, one to be chosen by the insured, one by
> this company, and the two thus chosen to select an
> umpire, and no right of action shall accrue within
> 30 days after such valuation shall have been de-
> livered in writing to this company, and the insured
> shall have tendered a conveyance of the insured
> estate or interest to a purchaser to be named by this
> company at such valuation, or at the price at which
> the insured shall have so contracted to sell it, less in
> any case the amount of any incumbrance on said
> insured estate or interest not hereby insured against,

and this company shall have failed within that time to find a purchaser upon such terms.''

From this it is clear these parties, in contracting with each other, fixed and determined this loss should be measured not by the cost price of the property, but by the selling price as determined by a contracted sale, or by the actual market price as determined by an appraisement. As there could be no sale of this strip, under the circumstances, the market price must control. The 59¼ feet southeast of the roadway projected is shown to be worth $15.00 per front foot, or $888.75. Thirty-seven feet northwest of this roadway is shown to be worth $15.00 per front foot, or $555.00, and the 24 feet remaining, we feel, should be put at $7.50 per front foot, or $180.00, thus making the plaintiff's total loss $1,623.75. This contract fixed the recovery at what Hail lost by the defect in his title; his loss was what he could have got for this strip if he could have sold it. Rulings of courts with similar questions before them, but possibly without such a contract provision relative to the measure of loss, and which will be of interest will be found in these cases: Pennsylvania Laundry Co. v. Land Title & Trust Co., 74 Pa. Super. Ct. 329; Whiteman v. Merion Title & Trust Co., 25 Pa. Super. Ct. 320; Murphy v. United States Title Guaranty Co., 104 Misc. Rep. 607, 172 N. Y. S. 243; Flockhart Foundry Co. v. Fidelity Union Trust Co. (N. J. Err. & App.) 132 A. 493; Glyn v. Title Guarantee & Trust Co., 132 App. Div. 859, 117 N. Y. S. 424; Wilson v. Bryn Mawr Trust Co., 225 Pa. 143, 73 A. 1071; Foehrenbach v. German American Title, etc., Co., 217 Pa. 331, 66 A. 561, 12 L. R. A. (N. S.) 465, 118 Am. St. Rep. 916; Bothin, et al. v. Cal. Title In. & T. Co., 153 Cal. 718, 96 P. 500, Ann. Cas. 1914D, 634, and following this case there is an exhaustive and instructive note.

Finding in this record no error affecting the substantial rights of the title company, the judgment is affirmed upon the original appeal, and, for the error made in the assessment of the amount of the recovery, it is reversed upon the cross-appeal, with direction to enter a judgment in favor of Hail for $1,623.75, with interest from May 29, 1925, the date of the filing of his petition.