[Civ. No. 15247.  First Dist., Div. One.  Feb. 17, 1953.]

A. E. OVERHOLTZER et al., Plaintiffs and Appellants, v. NORTHERN COUNTIES TITLE INSURANCE COMPANY, Defendant and Appellant.

Howard B. Crittenden, Jr., for Plaintiffs and Appellants.

DeMeo & DeMeo and J. N. DeMeo for Defendant and Appellant.

PETERS, P. J.—The Northern Counties Title Insurance Company issued a policy in the amount of $3,000 to A. E. and Orpha Overholtzer. The company failed to discover a certain recorded easement constituting a cloud on the title. The Overholtzers later discovered the easement, engaged in litigation with the holder of the easement, and then brought this action against the insurance company for damages caused by the existence of the easement. The prayer is for $3,000, the full amount of the policy, and for $488.49, on the covenant to defend contained in the policy, that being the amount expended by the Overholtzers in the defense of the easement litigation, the insurance company not having participated therein. The trial court found in favor of the Overholtzers for the full amount of the litigation expenses, and found the general damages to be $1,000. From the judgment for $1,488.49 both sides appeal.

The title policy is dated October 6, 1947, and insures the Overholtzers against "all loss or damage not exceeding the sum of Three Thousand & no/100ths . . . dollars which any Insured shall sustain by reason of . . . any defect in, or lien or encumbrance on said title" except those listed. The property involved consists of 2.88 acres in Sonoma County purchased by the Overholtzers from one Osmon. At about the same time the Overholtzers purchased an adjoining parcel of 2.31 acres adjacent to the state highway from one Merrifield, it being contemplated by the Overholtzers that they would develop the two parcels as a unit for an industrial use. At the time of purchase the Osmon property was agricultural land. The title company had no knowledge of the proposed industrial use.

The title company failed to list in its policy an easement properly recorded January 19, 1946, whereby Osmon had granted to one Musso the right to construct and maintain a water pipe across the northerly boundary of the Osmon property for a distance of about 450 feet. This pipe line was constructed before the Overholtzers purchased the property, and, although it was supposed to be underground, it was, in fact, exposed in several places. Mr. Overholtzer could not recall seeing the pipe before the purchase, but admitted that Osmon had told him there was a pipe line across the property leading to the Mussos' property. Overholtzer did not then know, however, that this pipe line existed by reason of the grant of an easement.

The two parcels are so located that there is a sharp rise from the Osmon to the Merrifield property up to the highway, forming an embankment. Immediately after the purchase, the Overholtzers started preparations for the construction of a lumber mill. They first levelled the two lots and a fill was made at the base of the embankment. It is here that the 2-inch Musso pipe is located so that such pipe instead of being 6 to 18 inches deep, is now 6 to 8 feet deep in this area. A 60-foot wide improved road was constructed from the highway over the fill and hence over the water pipe. Thus, access was secured to the Osmon parcel, and to the lumber mill. There is another alternative ungraded road that branches off from the main road and crosses, in part, adjoining property. Overholtzer testified that this road was occasionally flooded in winter, was too narrow to permit proper use, and, if used as the sole means of access, would deprive the two parcels of the benefits of direct highway access.

A fully equipped lumber mill was constructed on the Osmon parcel, and a house on the Merrifield parcel. The mill went into operation in late January of 1948. The total cost of the venture was about $53,000, but this included $2,200 as the purchase price of the Merrifield parcel, $4,000 for the construction of the house on that parcel, and $2,000 for levelling and filling, which benefited both parcels. The two parcels were used as a unit in the operation, the Merrifield parcel for drying the lumber and the Osmon parcel for the mill operation.

At a time when the mill was almost completed, Overholtzer got into a dispute with the Mussos over the use of one of the Mussos' power poles. Mrs. Musso told Overholtzer that she did not like the mill located below her, and for that reason would not grant the requested permission to use the pole. Thereupon Overholtzer threatened to compel the removal of the pipe line. Mrs. Musso claimed a right of way, but Overholtzer denied the existence of such right. He read and re-read the policy, noted its omission to mention any such right of way, and then, without legal advice or notification to the title company, cut the Mussos' pipe. As a result, on January 9, 1948, the Mussos brought suit against the Overholtzers, claiming an easement for their pipe line and requesting damages and an injunction to prevent interference with the pipe line. The Overholtzers consulted their then lawyer and under date of January 20, 1948, he notified the title company of the Musso litigation, of the issuance by it of the title policy, that he, the attorney, believed "that no such easement existed" and concluded as follows: "I am taking steps necessary to protect Mr. and Mrs. Overholtzer in this action, but I am giving you notice as there may be necessary a later settlement between you and Mr. and Mrs. Overholtzer." Shortly after this letter was written the attorney called upon Daw, the president of the title company. According to Daw, he told the attorney that he had checked the records, found that the easement did exist, and that "there was no defense to this action, so far as the easement was concerned, it was a matter of record." Daw also testified that he told the attorney that the title company was not ready to make a settlement "but in the event it was found that a loss accrued to Mr. Overholtzer, why, of course, we would have to pay up to the extent of our policy, that that was the procedure we would follow."

Without further communication with the title company the

Overholtzers defended the Mussos' action. They filed an answer and affidavit. The title company on this appeal, in an attempt to deny to the Overholtzers the litigation costs of the Musso litigation, claims that by these pleadings the Overholtzers admitted the existence of the easement, and that the Overholtzers' defense in that action was not relevant to any dispute over the title of the easement. Thus, so the title company claims, there was nothing that it was required to defend in that litigation. The contention that the Overholtzers' answer admitted the validity and existence of the easement is clearly without merit. While the Overholtzers there admitted that there had been an agreement between Osmon and the Mussos, they denied all of the rest of the allegations in the relevant paragraph of the complaint, and thus denied that such agreement was for the challenged easement. The affidavit filed by the Overholtzers in the Musso litigation is more equivocal. In one paragraph it avers that the Osmon parcel when purchased by them was subject to a right of way, and then avers that in locating and constructing the easement the Mussos did not follow the agreement but constructed the pipe line on property not included within the easement. Thus, whether or not the existence of the easement was placed into issue in the Musso litigation, clearly its validity, at least as to location, was there challenged.

It should be mentioned that the Musso litigation also involved the Cavallos, neighbors adjoining the Merrifield parcel, who were brought into the action by the Overholtzers because of a boundary dispute.

In the Musso action, after trial, the judge's order for findings contains a two-page discussion as to the existence of the easement, and then holds that the location of the easement was acquiesced in by Osmon. The final judgment was entered in the Musso action on August 25, 1949. It denied damages against the Overholtzers, decreed the Mussos' ownership of the easement with the right to enter to repair, and permanently enjoined the Overholtzers from interfering with the rights thus fixed.

In the present action Overholtzer testified that in the Musso action he was required to pay a surveyor $87.50 for checking the location of the pipe line. Plaintiff also testified that on June 2, 1949, he received a bill from his attorney for legal services rendered in the Mussos' action of $350, and for $50.99 expended for costs. All of these items, totalling $488.49, to-

gether with interest from September 13, 1949, were allowed against the title company.

In the present action the Overholtzers tried to show the general damages incurred by reason of the easement in several ways. They first testified that in March, 1949, they had leased the mill and properties to a tenant and given him an option to purchase for $45,000. Thus, argue the Overholtzers, presuming a total investment of $52,000 or $53,000, the difference of $7,000 or $8,000 was caused by the easement. The title company correctly calls attention to the fact that the total investment includes $2,200 for the Merrifield property and $4,000 for the house constructed thereon, and contends that the damages must be limited to the Osmon property. The Overholtzers contend that the two parcels were purchased together, are operated as a unit, and should be considered together for purposes of damages.

The title company also contended at the trial that if the value of the improvements were to be considered, which it denied, then the depreciation in the value of the machinery must be deducted from the investment, that machinery having been in use for over two years at the time of trial. After considerable discussion the parties stipulated to a set of rates of depreciation for different items.

The Overholtzers also sought to show loss in value caused by the easement in that the pipe line under the road might be dug up at any time for repairs and that this loss of security of access adversely affected the market value of the premises for a lumber mill. Overholtzer also testified that the Mussos had threatened to thus interfere with the operations of the mill. The Overholtzers produced a mill man who admitted that he was not an expert on real estate and that he was not qualified to appraise mill properties, but who, over objection, was permitted to testify that the existence of the easement with the constant possibility of interference with the access to the mill, depreciated the property as a mill between $15,000 and $20,000. The title company does not challenge the qualifications of this witness on this appeal. At the trial, it produced two qualified realtors who testified that the existence of the pipe line did not affect the market value of the premises.

The complaint states but one cause of action and is based upon the policy. It prays for damages of $3,000, the policy limit, and $488.49 for breach of the covenant to defend contained in the policy. The answer alleged that an inspection of the premises would have disclosed the easement, and

averred, in defense of its admitted failure to defend the Musso action, that there had been no request that it defend and that it had not granted any "written authorization," as required by the policy to the Overholtzers, to conduct the litigation.

The trial court, after finding the issuance of the policy, its terms; and that the policy failed to disclose the existence of Mussos' easement, found that, "in reliance upon said title policy" and because of his belief engendered thereby that there was no such easement, Overholtzer cut the pipe and was sued by the Mussos. The court found that the Musso litigation was brought to establish the Mussos' right to the easement; that the Overholtzers "notified" the company of the litigation "as provided in said contract of insurance," but the title company "refused and neglected to defend, appear for, or instruct or employ counsel"; that it became necessary for the Overholtzers to do so and to employ a surveyor. After finding the results of that litigation the court found the reasonable attorney fees and costs and surveyor fees thus incurred totalled $488.49.

The court then found that the Overholtzers acquired the Osmon and Merrifield parcels for industrial purposes and with the intent to develop them as a unit, but that when acquired the Osmon parcel was used for agricultural purposes; that the land was acquired in reliance upon the representation contained in the contract of insurance that there were no easements, and in such reliance made the extensive improvements already described. The court fixes the value of the improvements at $50,000, and the value of the land at the date of trial for industrial purposes at $3,000 an acre, but for agricultural purposes at $600 per acre. The court then finds that the easement adversely affects the value of the Overholtzers' property by reducing the value of the land and improvements $15,000. Then the court finds that on the date the Overholtzers purchased the Osmon tract it was only worth $2,000 for agricultural purposes instead of the $3,000 the Overholtzers paid for it, and that the difference of $1,000 was caused by the easement.

The conclusions and judgment allowed awards against the title company as follows: $488.49 for breach of the covenant to defend with interest thereon from September 13, 1949, and upon the insurance policy $1,000 for depreciation in the value of the land as agricultural land fixed as of the date of purchase, with interest from the date of purchase, namely,

October 6, 1947. The court expressly disallowed any recovery for diminution in value of the improvements caused by the easement, or for any diminution so caused to the value of the land as industrial land. From this judgment both sides appeal.

## The Title Company's Appeal

The title company raises several technical objections to the entire judgment. Before discussing these in detail certain general observations should be made. This is a suit on a title insurance policy. The Overholtzers secured such policy to protect them against defects in their title, and paid a premium, fixed by the company, for such protection. The insurance company failed to discover the existence of a recorded easement that constitutes a cloud on the title. As found by the trial court, which finding is supported, the Overholtzers bought the Osmon property, and an adjoining parcel, in the belief, induced by the policy, that they had clear title, and constructed over $50,000 of improvements. They had such faith in the insurance company's representations that they cut the pipe and were thus forced into litigation. ■ Under such circumstances the title company should not be permitted to avoid liability on technicalities or upon a literal interpretation of an isolated clause of the policy that is qualified by other clauses. ■ Title insurance policies should be interpreted in the same fashion as are other insurance policies, that is, liberally in favor of the insured, and against the insurer. Title insurance is practically an unregulated business. No state control is exercised over the terms of the policies or over rates. The companies frame the policies. ■ When the very contingency happens that was insured against, only clear and compelling reasons should permit a court to deny to the insured full reimbursement for all losses, up to the face amount of the policy, sustained because of the happening of such contingency. (See 9 Appleman, Insurance Law and Practice, § 5201, at p. 3; p. 12, § 5209; *Coast Mutual B.-L. Assn.* v. *Security Title Ins. & Guar. Co.,* 14 Cal.App.2d 225 [57 P.2d 1392]; *National H. Co.* v. *Title Ins. & Tr. Co.,* 45 Cal.App.2d 215 [113 P.2d 906]; *Blackburn* v. *Home Life Ins. Co.,* 19 Cal. 2d 226 [120 P.2d 31].)

With these general principles in mind we turn to the title company's arguments.

■ It is first urged that there is no liability for the litigation expense on the covenant to defend because the Overholtzers failed to plead or to prove that the litigation was

carried on with the "written authorization" of the title company as required by the policy. The clause relied upon is condition number 7 which reads in part as follows: "The Company will pay, in addition to any loss insured against by this Policy, all costs imposed upon the Insured in litigation carried on by the Company for the Insured, and in litigation carried on by the Insured with the written authorization of the Company but not otherwise. . . ." But this is not the only clause relating to the obligations of the title company. Condition number 2 provides in part: "The Company at its own cost shall defend the Insured in all actions or proceedings commenced against the Insured founded upon a defect, lien or encumbrance insured against by this Policy and may pursue such litigation to final determination in the court of last resort. . . . In all cases where this Policy permits or requires the Company to prosecute or defend any action or proceeding, the Insured shall secure to it the right to so prosecute or defend such action or proceeding, and all appeals therein, and permit it to use, at its option, the name of the Insured for such purpose. . . ."

Thus by this last clause, strictly interpreted against the company, a duty to defend upon notification of the pending litigation arises. There can be no doubt that the title company was notified of the Musso litigation by telephone and by letter. When so notified the company was under a duty to defend its insured. When it failed to defend, the Overholtzers had to defend themselves. The company, in view of such apparently conflicting provisions, should not be permitted to escape liability because they did not authorize in writing such defense.

Even if condition 7 be read alone, so as to require written authorization, the facts show a waiver of that provision. According to the testimony of the president of the title company, when the attorney for the Overholtzers had notified him of the pending litigation, he did not either offer to defend that action or instruct the lawyer not to defend. What he did was to tell the lawyer that the title company was not ready to settle yet "but in the event it was found that a loss accrued to Mr. Overholtzer, why, of course, we would have to pay up to the extent of our policy, that that was the procedure we would follow." While the president did tell the attorney that "there was no defense to this action, so far as the easement was concerned," he did not instruct the attorney not to defend. It must be remembered

that the Musso action involved not only an application for an injunction, but also a prayer for damages. What were the Overholtzers to do? Allow a default judgment for damages to be taken against them? The evidence shows that the pipe was cut in reliance on the terms of the policy. Any damages resulting therefrom were directly caused by the failure of the title company to discover the easement. Under such circumstances it would result in a miscarriage of justice to permit the company to raise the "written authorization" provision based upon their failure, after notice, to defend the Musso action. By their actions the company has waived strict compliance with the condition. (See, generally, *Purcell v. Land Title Guarantee Co.*, 94 Mo.App. 5 [67 S.W. 726]; *Fidelity Union Casualty Co.* v. *Wilkinson*, (Tex.Civ.App.) 94 S.W.2d 763; aff. in 131 Tex. 302 [114 S.W.2d 530]; 9 Appleman, Insurance Law and Practice, p. 21, § 5213.)

The next contention of the title company also lacks merit. It is contended that the Overholtzers did not plead or prove any legal damage but only pleaded and proved a hypothetical damage—that is, possible damage to the road if the pipe had to be repaired. The point lacks merit. The damage results from the cloud on the title. If that cloud impairs the market value of the land, the Overholtzers are entitled to whatever damages resulted from that cloud. As to just when such damages should be computed, that point will be later discussed. So far as pleading and proof are concerned, an allegation and proof of the existence of the easement and of diminution in the market value are all that is required. Certainly, the Overholtzers did not have to wait until the pipe broke. (See 128 A.L.R. 373; *Glyn* v. *Title Guarantee & Trust Co.*, 132 App.Div. 859 [117 N.Y.S. 424].)

The title company next urges that the complaint is defective in failing to allege reliance upon the policy. If an allegation of reliance is necessary on a cause of action based on a guarantee of title (as distinguished from the liability of an abstracter—see *Title Ins. & Trust Co.* v. *Los Angeles*, 61 Cal.App. 232 [214 P. 667], for the distinction between the two), such requirement was here waived, because Mr. Overholtzer directly testified that he relied upon the policy in cutting the pipe. (See *Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375 [240 P.2d 580].)

After these unsound attacks on the pleading, the title company turns its attention to the findings. It contends that the trial court failed to make a finding as to whether the

Overholtzers complied with the following condition of the policy: ". . . In case any such action or proceeding shall be begun, or in case knowledge shall come to any Insured of any claim of title or interest adverse to the title as insured, or which might cause loss or damage for which the Company shall or may be liable by virtue of this Policy, such Insured shall at once notify the Company thereof in writing. If such notice shall not be given to the Company at least five days before the appearance day in any such action or proceeding, or if such Insured shall not, in writing, promptly notify the Company of any defect, lien or encumbrance insured against or any such adverse claim which shall come to the knowledge of such Insured, in respect to which loss or damage is apprehended, then all liability of the Company as to each Insured having such notice in regard to the subject of such action, proceeding or claim shall cease and terminate, provided, however, that failure to so notify shall in no case prejudice the claim of any Insured unless the Company shall be actually prejudiced by such failure."

The contention is made that had a finding been made on this issue, the court would have had to find that the Overholtzers did not comply therewith because the evidence shows that they cut the pipe before consulting with the insurance company. It is contended that had such consultation been had, the entire litigation could have been avoided. What this contention amounts to is this: That although the Overholtzers had such faith in the insurance company that they honestly and reasonably believed that such insurance company would not overlook a recorded easement, they should not have cut the pipe but should have run to the insurance company and asked it if it had made a mistake. Failure to do so prevents recovery, even though, in so acting, the Overholtzers reasonably relied upon the provisions of the policy. Of course, the Overholtzers knew of the pipe and knew of the claim of the Mussos to a right of way, but when they read the policy they reasonably believed that since the policy did not mention it, it was a mere license, and that the pipe could be cut. To give the quoted clause the meaning and legal effect ascribed to it by the title company would be to entrap the insured. The question is, did the Overholtzers act reasonably in cutting the pipe without notifying the title company? Under the findings and evidence, to which reference has already been made, there could be only one answer to that question, namely, that the self-help employed by the

Overholtzers in reliance on the policy was reasonable and did not violate the above clause.

The title company next points to one of the exceptions contained in the policy to the effect that the company does not insure against "Any facts which a correct survey and inspection of said land would show," and contends that it was entitled to a finding as to what an inspection would show. The evidence is conflicting as to what an inspection would have shown. This contention is simply another way of stating the reliance argument. Knowledge of the existence of the pipe was not knowledge of the existence of the easement. If, after the Mussos directly informed the Overholtzers of the existence of the pipe line, the Overholtzers acted reasonably in relying on the policy and reasonably believed, based on the terms of the policy, that there was no easement, then, obviously, inspection would not have disclosed the existence of the easement. The court has found reliance, and, this being so, failing to find on what an inspection would have disclosed was not error.

The title company also urges that litigation expenses should not have been allowed at all because, so it is claimed, the Musso litigation did not involve the validity of the easement. The facts in reference to this contention have already been set forth in detail. As there pointed out, the Overholtzers did not, as the title company claims, admit in their answer the existence of the easement. The order for findings and the findings demonstrate that the trial court in that action did rule on the existence of the easement. While the affidavit of the Overholtzers did seem to admit the existence of the easement, it did not ascribe any legal effect thereto. In addition, the location of the easement was challenged, and therefore its validity was in issue. Damages were successfully opposed. While the case did involve some issue as to the Cavallos, and no apportionment of expenses was made, the Overholtzers established a prima facie case when they offered evidence of their expenses, and it was up to the title company to prove, if it could, that all such expenses were not incurred in connection with the easement. If, as appears, the major expense was so incurred, and if it is impossible to apportion, then the title company is liable for the total expense.

The title company also objects to the $87.50 allowed for the survey. It seems obvious that if the Overholtzers had been able to defeat the claimed easement on the ground of mislocation, it may well have resulted in direct benefit to the insurance company. The point is without merit.

The title company also objects to the allowance of $1,000 damages for diminution in value of the insured property, contending that the evidence of damage is speculative and hence improper. It seems to be the theory of this appellant that there could be no damage until actual physical interference with the use of the land occurred. That is not the law. The mere existence of the easement created a cloud on the title. If that cloud resulted in diminution of the market value of the property then recoverable damage resulted. However, for reasons to be discussed on the appeal of the Overholtzers, we are of the opinion that there must be a new trial on the issue of damage, and for that reason no further discussion of the issue is necessary.

The title company correctly, in part, challenges the awards of interest. The trial court allowed interest on the $1,000 from the date of the policy and on the $488.49 from September 13, 1949, which the trial court erroneously found to be the date of the entry of the judgment in the Musso action—the correct date was August 25, 1949. Interest on the two items of damages must be separately considered. First, as to the allowance of interest on the litigation expenses. Section 3287 of the Civil Code provides: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt." This section has been a prolific source of litigation. However, it can be said that where the amount in question is calculable under or calculated by the contract, interest is allowable. (*Jacobs* v. *Farmers' Mut. Fire Ins. Co.*, 5 Cal.App.2d 1 [41 P.2d 960]; *Koyer* v. *Detroit F. & M. Ins. Co.*, 9 Cal.2d 336 [70 P.2d 927]; *Pellas* v. *Ocean Acc. & Guar. Corp.*, 24 Cal. App.2d 528 [75 P.2d 635].) The policy does not here fix the date that such litigation expenses are payable. Obviously the amount thereof became fixed, for interest purposes, when liability therefor was incurred by the Overholtzers. We do not have to decide whether that date was when the services were contracted for or when the Overholtzers were billed for such services, because either date was long prior to September 13, 1949. The Overholtzers do not complain that the interest should have been allowed from a prior date, and obviously the title company is not injured by having

the date fixed at a time much later than the Overholtzers legally could have had it fixed. For these reasons, the allowance of litigation expenses and the interest thereon should be affirmed.

But when we come to the interest on the damage to the market value of the land caused by the easement, another problem is presented. Although this item of damage must be reversed for reasons hereafter stated, and so, of course, the award of interest likewise must be reversed, because of the impending new trial on the issue of damages we should, for the guidance of the trial court on such retrial, pass on this issue.

The measure of damages here is the depreciation in market value caused by the existence of the easement (as of what time will hereafter be discussed). While diminution in market value can sometimes be fixed or is reasonably ascertainable and therefore interest is allowable under the above section, such can be allowed only when the diminution is fixed or reasonably ascertainable. (*Lineman* v. *Schmid,* 32 Cal.2d 204 [195 P.2d 408, 4 A.L.R.2d 1380]; *Indemnity Ins. Co.* v. *Watson,* 128 Cal.App. 10 [16 P.2d 760]; *Minton* v. *Mitchell,* 89 Cal.App. 361 [265 P. 271].) Here the policy does not fix the date when liability accrues, nor does the policy provide how damages are to be computed. Obviously, diminution of market value caused by the easement is not a fixed nor computable sum. The evidence in the instant case demonstrates how difficult the ascertainment of that item may be. For the reasons stated the demand is unliquidated within the meaning of the section and interest on the award, if any is made, should run from the date of judgment. (*Swafford* v. *Goodman,* 115 Cal.App.2d 105 [251 P.2d 680]; *Axell* v. *Axell,* 114 Cal.App.2d 248 [250 P.2d 182].)

### The Cross-Appeal of the Overholtzers

One of the major contentions of the Overholtzers on their appeal is that they should have been permitted to amend to conform to proof so as to allege a cause of action upon a claimed common law liability of the title company as abstracter—a liability claimed to exist that sounds in negligence for defective search of the title in the abstracting process. The question as to whether a title insurance company is liable not only as an insurer up to the face amount of the policy, but, where negligence can be shown, as an abstracter and in excess of the face amount of the policy, is an interesting one. In the briefs and supplemental briefs

many cases and theories are discussed dealing with this problem. The cases are in conflict. Strong arguments can be made on each side of the controversy. We do not find it necessary to decide whether such liability exists in this state because it is our opinion that the point is not properly before us.

As already pointed out, the complaint alleges but one cause of action which is admittedly predicated entirely on the policy. The complaint does not suggest or even hint at a possible liability for negligence as an abstracter. But the Overholtzers contend that they made a motion to conform by proof raising this issue. The only place in the record that suggests that some undisclosed motion was made to conform to proof is a portion of the last sentence of the conclusions of law. That portion of the sentence reads as follows: "and because neither nor both of said plaintiffs are entitled to recover by reason of their reliance upon said policy and the statements therein contained, their request to amend their complaint to conform to the proof is denied." What the first portion of this quoted phrase means we do not know. What amendment to conform to proof the court is talking about, when it was made, and to what it related is not disclosed by the record. Obviously, such motion could not have been made until after the completion of the trial because the reporter's transcript discloses no such motion. If the proposed amendment did attempt, as claimed by the Overholtzers, to state a cause of action for negligence as abstracter, that would have been an entirely new cause of action from the one stated in the complaint. When the motion was made, such new cause of action would have been barred by section 339(1) of the Code of Civil Procedure. Thus, in view of the record, it is quite obvious that the trial court acted well within its discretion in denying the motion to amend, whatever that motion may have been.

The Overholtzers also object to the method used in computing damages in the present case. As already pointed out, the trial court fixed damages as of the date the policy was issued and limited the damages to the diminution in the value of the property caused by the easement measured by the use to which the property was then devoted. The court found that at the date of purchase the property was used for agricultural purposes and that for such purpose the property without the easement was worth $3,000, but with the easement

was worth but $2,000, hence allowed $1,000 as damages. The court also found that the Overholtzers purchased the property and an adjoining parcel for an industrial use, and devoted the two parcels to such use. It also found that the easement depreciated the value of the property as actually used by the Overholtzers at least $15,000. This finding, repudiated as a measure of damages by the trial court by its findings and judgment, is based on the highly questionable testimony of one witness, a mill operator, not versed in real estate operations.

The findings present the question as to the proper time for the valuation of the property for purposes of damages in such cases—is it the diminution in the market value of the property caused by the defect and measured at the time of purchase, market value being measured by the use to which the property is then devoted, or is it the diminution in value as of the time of the discovery of the defect measured by the use to which the property is then being used? In either event, maximum liability is measured by the face amount of the policy.

It seems quite apparent to us that liability should be measured by diminution in the value of the property caused by the defect in title as of the date of the discovery of the defect, measured by the use to which the property is then being devoted. When a purchaser buys property and buys title insurance, he is buying protection against defects in title to the property. He is trying to protect himself then and for the future against loss if the title is defective. The policy necessarily looks to the future. It speaks of the future. The present policy is against loss the insured "shall sustain" by reason of a defect in title. The insured, when he purchases the policy, does not then know that the title is defective. But later, after he has improved the property, he discovers the defect. Obviously, up to the face amount of the policy, he should be reimbursed for the loss he suffered in reliance on the policy, and that includes the diminution in value of the property as it then exists, in this case with improvements. Any other rule would not give the insured the protection for which he bargained and for which he paid.

There may be some conflict in the authorities on this subject but the weight of authority and the better reasoned cases support the views above expressed. (See 9 Appleman, Insurance Law and Practice, p. 24, § 5217; 7 Couch, Cyclopedia of Insurance Law, p. 6286, § 1887; 6 Cooley's Briefs on Insurance (2d ed.), p. 5726; see, also, *Pennsylvania Laundry*

*Co.* v. *Land T. & Tr. Co.,* 74 Pa.Super. 329 (a seven-man intermediate appellate court) ; *Buquo* v. *Title Guaranty & Trust Co.,* 20 Tenn.App. 479 [100 S.W.2d 997] ; *Kentucky Title Co.* v. *Hail,* 219 Ky. 256 [292 S.W. 817] ; *Narberth Bldg. & Loan Assn.* v. *Bryn Mawr Trust Co.,* 126 Pa.Super. 74 [190 A. 149].) There may be a few cases contrary, but most of them involved distinguishable factual situations. (See *Murphy* v. *United States Title Guaranty Co.,* 104 Misc. 607 [172 N.Y.S. 243] ; *Glyn* v. *Title Guarantee & Trust Co.,* 132 App.Div. 859 [117 N.Y.S. 424] ; *Beaullieu* v. *Atlanta Title & Trust Co.,* 60 Ga.App. 400 [4 S.E.2d 78].)

We believe the majority rule is sound and should have been followed in the present case.

For the above reasons the judgment is affirmed insofar as it imposes liability on the title company for damages based on the terms of the policy and for violation of the covenant to defend; the award of $488.49 with interest for damages for violation of the covenant to defend is affirmed; the award of $1,000 damages is reversed and the cause remanded to the trial court for the sole purpose of retrying that issue of damages in accordance with the views herein expressed. In the interests of justice the Overholtzers shall recover costs on both appeals. It is so ordered.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied March 19, 1953, and defendant and appellant's petition for a hearing by the Supreme Court was denied April 15, 1953.