Filed 12/23/14  Gaviota Holdings v. Chicago Title Ins. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| GAVIOTA HOLDINGS, LLC, | 2d Civil No. B252740 |
| Plaintiff and Respondent, | (Super. Ct. No. SB 1385804) |
| v. | (Santa Barbara County) |
| CHICAGO TITLE INSURANCE COMPANY, | |
| Defendant and Appellant. | |

Chicago Title Insurance Company, appellant, issued a policy insuring the title to property purchased by Gaviota Holdings, LLC, respondent.  The property was burdened by a recorded easement, but the policy failed to disclose its existence.  After respondent discovered the easement, it brought the instant action against appellant.  Respondent alleged that appellant had breached the title policy by failing to compensate it for the decline in value of the property caused by the undisclosed easement.  Following a court trial, respondent was awarded damages of $1.51 million for the decline in value and $305,362 for violation of an implied covenant of good faith and fair dealing.

We reject appellant's arguments that (1) respondent's expert witness was not qualified to testify as an expert, and (2) substantial evidence does not support the trial court's finding that the easement caused a $1.51 million decline in value of the property.  On the other hand, appellant correctly contends that the trial court erred in ordering

prejudgment interest on the $1.51 million award from the date respondent submitted its proof of loss to appellant. Interest did not begin to accrue until respondent filed its action. We reverse as to the prejudgment interest issue and affirm in all other respects.

*Background*

The property at issue (the Property) is a 38.22-acre parcel of oceanfront land "just outside the City limits of Goleta" in an unincorporated area of Santa Barbara County. Respondent's appraisal expert, David Marx, testified: "This is a premier oceanfront estate type property, so developing a single family estate with guesthouse and a pool . . . would be the highest and best use of this site." Zoning laws permit the construction of only one single-family residence on the Property.

In 1979 the owner of the Property granted a "right of way" easement to Pacific Lighting Service Company and its "successors and assigns."[1] On the right of way, the holder of the easement is entitled to lay and operate pipelines, including appurtenant equipment, "for the transportation of gas [and] petroleum products." The holder of the easement is also entitled to "maintain a patrol road along the right of way with the right to reasonable ingress and egress over grantor's property to and from [the] right of way." The area of the right of way is 1,625 square feet. The area required to provide ingress and egress is approximately 3,300 square feet. "The easement is located at the only entry to the . . . [P]roperty."

Starting in 1979, the owner of the Property leased 3.8 acres to Venoco, Inc. (Venoco), and Exxon Mobil Corporation (Exxon). The leased area included the land

_____

[1] We assume that Pacific Lighting Service Company was associated with Pacific Lighting. Pursuant to Evidence Code sections 459 and 452, subdivision (h), we take judicial notice that Pacific Lighting was a predecessor of Sempra Energy, the parent company of Southern California Gas Company. (See http://www.socalgas.com/news-room/company-history.shtml.)

subject to the easement.[2]  The lease permitted the tenants to use the leased area for their "oil and petroleum extraction and processing operations."  The tenants used a roadway in the leased area to gain access to the Ellwood Pier, which they leased from the State of California.  The pier is adjacent to the Property.  The tenants used the pier "to transport personnel, supplies and equipment in connection with [their] offshore oil and gas and related petroleum operations."

The leased area was divided into two parts:  "Exclusive Areas" and "Non-Exclusive Areas."  In the Non-Exclusive Areas the tenants had the right "[t]o pass to and fro over such areas with automobiles, trucks, tractors and similar conveyances, and to transport cargo and personnel."  In the Exclusive Areas the tenants also had the right to erect and maintain "structures, storage tanks, fuel tanks, pipelines, [and] power lines."  In addition, in the Exclusive Areas they could "park automobiles, trucks, tractors and similar conveyances."  The easement was in the Non-Exclusive Areas.

The third modification of the lease commenced on September 30, 2005, and expired on September 30, 2010.  The yearly rent was $350,000 with annual increases equal to the increase in a consumer price index.

In 2007 respondent purchased the Property for the purpose of constructing a single-family residence.  In July 2010 respondent, Venoco, and Exxon signed a new 10-year lease of the 3.8 acres.  The yearly rent under the new lease, which does not expire until September 30, 2020, is $1.2 million increasing to $1.32 million in 2015.

At the time of respondent's purchase of the Property, a natural gas transfer, odorizing, and metering facility (the facility) was located aboveground on the easement next to the sole entrance to the Property.  Venoco delivers unscented gas to the facility

_____

[2] In its opening brief, appellant asserts that Venoco is "a successor to the original grantee" of the easement, Pacific Lighting Service Company.  But appellant does not support its assertion by citation to the record.  We therefore disregard the assertion.

via a high pressure, underground pipeline. The "line is 8 [inches in] diameter out-of-the-ground and 6 [inches in] diameter into the facility." The gas comes "from Venoco's sole gas producing offshore platform." At the facility the gas is transferred from Venoco's custody to the custody of Southern California Gas Company. As required by law, the gas company odorizes the gas. On-site equipment monitors the quality and quantity of the gas transferred. "Pipeline 'upstream' from this facility is the property of Venoco; the facility proper and pipeline 'downstream' of this facility are the property of the Gas Company." "The gas pipelines which enter and depart the Facility do not cross over any portion of the Property not covered by the Easement."

A photograph of the facility is attached to this opinion as Appendix A. The photograph shows that the facility is surrounded by a high chain-link fence. Signs are posted on the fence. One of the signs warns that there is a "high pressure gas pipeline" and that the gas company should be contacted "before excavating in area."

Appendix B is a map of the 3.8 acres of the Property leased by Venoco and Exxon. The map was attached to the third modification of the lease. It shows the division of the leased area between Non-Exclusive Areas and Exclusive Areas. The facility is in the Non-Exclusive Areas at the top of the map next to the entrance to the Property. We have added an arrow showing the location of the facility. A roadway runs from the entrance through the leased area. This was the roadway that the tenants used to gain access to the Ellwood Pier.

When respondent purchased the Property in 2007, it assumed that the facility was there pursuant to the lease. The facility, however, was there pursuant to the recorded easement, the existence of which was not disclosed in appellant's title report or policy. Respondent did not discover the easement until June 25, 2008.

In March 2012 respondent filed a complaint consisting of three causes of action. The first cause of action alleged that appellant had breached the policy of title insurance by failing to compensate respondent for damages sustained as a result of the undisclosed easement. The second cause of action alleged that appellant had breached an implied

4

covenant of good faith and fair dealing "by failing to effectuate a prompt, fair, and equitable settlement of [respondent's] claim." The third cause of action sought "a determination of the parties' rights and duties under the Title Policy." The trial court's judgment declared that the third cause of action "is moot."

In its opening brief, appellant states: "At trial, [appellant] admitted that the Easement was not listed as an exception from coverage under the Title Policy, that there were no applicable exclusions to coverage, that [respondent's] claim was a covered loss, and that [respondent] had suffered damages. Thus, the central issue to be determined at trial was the extent of damages as measured by the diminution in value to the [P]roperty caused by the Easement." When a title policy fails to disclose an easement, "liability should be measured by diminution in the value of the property caused by the defect in title as of the date of the discovery of the defect, measured by the use to which the property is then being devoted." (*Overholtzer v. Northern Counties Title Ins. Co.* (1953) 116 Cal.App.2d 113, 130.)

David Marx, respondent's expert, opined that when respondent discovered the easement in June 2008, the value of the Property without the easement was $18.8 million, including $800,000 for the lease that was due to expire in 2010. Marx further opined that in June 2008 the easement had caused a $1.51 million decrease in the Property's value. The decrease was approximately eight percent of its value without the easement. The eight percent reduction included a decline in value of approximately four percent ($750,511) because of the adverse market reaction to (1) "hazard signs" posted at the facility and (2) the possibility that a gas explosion or soil contamination could occur. The eight percent reduction also included a decline in value of approximately four percent ($720,490) because of the adverse market reaction to the Property owner's loss of privacy. The loss resulted from the easement holder's right to use the sole entry to the Property to access the easement. An additional decline in value of $37,229 was due to the Property owner's loss of use of the easement area.

Appellant's appraisal expert, Michael Arnold, opined that the easement had caused a decline in market value of $37,500 as of May 21, 2007, and $33,750 as of October 1, 2009. The trial court rejected Arnold's opinion and credited Marx's testimony. In its statement of decision, the court declared: "The evidence showed that the fair market value of the Property as of June 25, 2008 without the Easement was $18,800,000 while the fair market value of the Property with the Easement on the same day was $17,290,000, a diminution in value of $1,510,000."

The court awarded respondent $1.51 million in damages for the decline in value of the Property. It found that appellant had breached an implied covenant of good faith and fair dealing and awarded damages of $305,362, the amount of respondent's "attorneys' fees and costs [incurred] to recover the benefits owed to it under the Title Policy."

*Qualification of Marx as an Expert Witness*

Appellant contends that the trial court erroneously ruled that David Marx was qualified to testify as an expert on "the diminution in value [of the Property] due to the adverse environmental impact of the easement." " ' " 'The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " [Citation.]' [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 861.)

Appellant asserts that it "objected to [Marx's] qualifications to offer an opinion on the diminution caused by the adverse environmental stigma resulting from the easement." But "the trial court overruled the objection and required [appellant] to challenge the qualifications of the expert on cross-examination." In support of its assertion, appellant cites page 260 of the reporter's transcript. This page shows that, during respondent's direct examination of Marx, it moved to admit his appraisal report into evidence. Appellant's counsel protested: "We object on the basis -- and I'd like to take him [Marx] on a [Evidence Code section] 402 -- on the issue of the potential rupture, explosion of the gas facility which he opines on and he's not an expert on at all." The trial court replied: "I understand that that's your position. I'm not sure we really need a 402 hearing in a

6

Court trial. Can't you just handle it on cross?" Counsel responded, "I'd be happy to do that, your Honor." The court then overruled the objection to the admission of the report.

Page 260 of the reporter's transcript does not support appellant's assertion that it objected to Marx's qualifications to opine on the decrease in value of the Property "caused by the adverse environmental stigma resulting from the easement." Appellant objected to the admission of Marx's report on the ground that he was not an expert on the risk that the "gas facility" would "rupture" and explode. At page 251 of the reporter's transcript, appellant's counsel had earlier indicated that he did not object to Marx's qualifications "with respect to valuing the impact of easements on real property." Counsel said, "One of the things . . . that we did mention in our [trial] brief is that Mr. Marx varied from that and went over into another area and that's where we have our objection." The court replied: "Well, he's just asking that he be designated as an expert with respect to valuing the impact of easements on real estate, and I'll recognize that designation." Appellant did not object.

Because appellant failed to object that Marx was not qualified to testify as an expert on the decrease in value of the Property "caused by the adverse environmental stigma resulting from the easement," appellant has forfeited this issue. (Evid. Code, § 353; *People v. Brown* (2014) 59 Cal.4th 86, 100, fn. 8 ["This aspect of defendant's claim has been forfeited by his failure to object on this ground in the trial court"].)

Even if a forfeiture had not occurred, appellant has failed to meet its burden of showing that the trial court abused its discretion by permitting Marx to testify as an expert. (See *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1307 [" ' "On appeals challenging discretionary trial court rulings, it is *appellant's* burden to establish an abuse of discretion" ' "].) Appellant claims that there was no evidence that Marx had "special knowledge, skill, experience, training or education to appraise the loss of value due to environmental conditions." But Marx, who had started appraising real property in 1984, testified: "I've had pretty extensive experience with contaminated sites, environmental impacts and also easement issues. I've done a lot of work with that."

7

In any event, the issue here involved the market's reaction to an easement. The trial court reasonably concluded that Marx had the requisite expertise in this area. He had "experience evaluating the impact of easements upon real property" and had "testified in court on different easement issues." He had qualified "numerous times" as an expert, including five times within the prior twelve months. He is a member of the Appraisal Institute, which requires 100 hours of educational classes every four years. Some of the courses he took were relevant to the appraisal issues in the instant case.

*Substantial Evidence*

*Decline in Value Because of Environmental Threat*

Appellant claims that substantial evidence does not support the trial court's finding that the "potential environmental threat" of the easement caused an approximately four-percent decline in the market value of the Property. The court's finding was based on Marx's opinion to this effect. In its statement of decision, the court declared, "Mr. Marx's appraisal was comprehensive and credible." Appellant argues that Marx's appraisal has "no evidentiary value" because it was based on actual "environmental catastrophes" that decreased property values rather than, as here, the mere possibility of a future adverse environmental event.

"Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary . . . principle of law[] that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . . [Citations.]" (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

"We presume that the record contains evidence sufficient to support the judgment; it is the appellant's burden to demonstrate otherwise. [Citation.] We do not reweigh evidence or assess the credibility of witnesses on review for substantial evidence. [Citation.] Evidence is substantial if it is of 'ponderable legal significance . . . reasonable,

8

credible and of solid value.' [Citation.] An expert's opinion is substantial evidence if it has evidentiary support and is accompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion. [Citation.] While inferences may support a judgment, 'the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.' [Citation.]" (*San Diego Gas & Electric Company v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292.)

In arriving at the four-percent decline in value, Marx primarily relied upon the adverse market reaction to the possibility of an explosion at the facility. Marx testified: "There's been a lot of media coverage on gas explosions in the last five years and people are really aware of that issue, so there is definitely a marketplace awareness that there [are] some issues with potential gas explosions. And so you have to do some research to determine how the market is going to perceive this kind of issue or stigma."

Marx considered two catastrophic gas explosions. One occurred in 1994 in Edison Township, New Jersey, when "a 36-inch natural gas transmission pipeline ruptured." The rupture created a 40-foot deep crater "and sent debris as far as 800 feet." Eight buildings in a nearby apartment project were destroyed. After the explosion, "rental rates in the area declined" approximately 10 percent.

The other explosion occurred in 2010 in San Bruno, California, when a 30-inch natural gas pipeline ruptured. The explosion created a 40-foot deep crater, destroyed 55 homes, and killed eight people. After the explosion, "price levels" of homes in the area declined approximately 10 to 15 percent.

In his report Marx opined: "The risk of explosion at the subject site is considered far less likely than the events discussed." The gas "line is relatively small - at a reported 8 [inches] - and the potential for explosion is apparently low." "However, if an explosion occurred, it could destroy the only viable entrance to the site. At least for some period of time, the estate owner could be blocked from entry. As an above-ground facility, the subject facility is a visible reminder of the potential for damage."

9

Marx testified: "The risk of explosion at our subject site was definitely less likely than the events that occurred. . . . [T]he market data pointed to about a 10-percent impact, but that, I knew, set the upper limit and ours was much less of an impact. So I felt ours was definitely at the very lower end of the range. [¶] And therefore, I concluded a 3-percent to 5-percent impact for our subject and concluded in the middle of that range that 4 percent was supported by the market."

In its brief respondent summarizes Marx's reasoning as follows: "Based on all of the information he analyzed, Marx determined that actual gas-line ruptures or explosions caused, roughly, a 10-percent impact on market value. . . . Marx opined that the adverse impact on market value in this case would be significantly lower. He estimated the impact to be four percent. . . . [¶] Marx did not base his opinion on the probability that the Facility would explode. In fact, he admitted that the risk of an explosion was low, which factored into his four-percent diminution-in-value figure. . . . But the low 'probability' of an actual disaster was not material because 'the market' - the bedrock foundation for any appraiser's opinion - would view *the mere presence of the Facility* negatively and adjust the value of the Property accordingly."

In the ordinary case, Marx would have considered the extent to which gas transfer and odorizing facilities on other residential properties had diminished the market value of those properties. "But this was not an ordinary case. . . . [I]t is clear that [such facilities on residential property] are sui generis and that normal approaches to valuation are problematical. For this reason latitude must be accorded an expert in valuing such properties, and any approach that is 'just and equitable' may be considered. [Citations.]" (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1128; see also Evid. Code, § 823 ["the value of property for which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable"].)

Marx's method of valuation was neither unjust nor inequitable. He was not concerned with the likelihood of an explosion at the facility. He was concerned only with the adverse market reaction to the possibility of an explosion. Prior natural gas

explosions had resulted in about a 10 percent diminution in the value of nearby residential properties. Here there was no explosion. But the aboveground facility is not nearby; it is located on the Property next to its only entrance. Whenever the owner enters or leaves the Property, he cannot avoid being reminded of the facility's presence and the risk, however remote, of an explosion. Thus, Marx reasonably concluded that the perceived environmental threat of the easement had resulted in a four-percent decline in the Property's value. His opinion was not " 'based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.' " (*San Diego Gas & Electric Company v. Schmidt*, *supra*, 228 Cal.App.4th at p. 1292.) Accordingly, substantial evidence supports the trial court's finding that adopted Marx's valuation.

### *Substantial Evidence*
### *Decline in Value Because of Loss of Privacy*

Appellant claims that substantial evidence does not support the trial court's finding that adverse market reaction to the loss of privacy caused by the easement resulted in an approximately four-percent decline in the Property's value. The court credited Marx's opinion on this issue. In his report, Marx reasoned: "The easement itself results in a shared access to the subject 'estate' parcel [i.e., the Property]. . . . Although the subject entry was shared with Venoco for the pier access, that access was via a lease and not in perpetuity - as is the 'undisclosed' easement. The lease allows the owner to require compensation commensurate with the associated use and any loss of privacy: the easement does not." "Given the estate nature of the subject site, the associated loss of a private access would have" an impact on the Property's value.

Marx consulted real estate brokers in the area who "were in consensus that privacy is a significant issue in estate properties, with a shared access having say 5% to 10% or more of an impact on property value." In view of "the probably 'limited use' of the shared access by Venoco under the easement . . . along with the possibility of 'creating' a secondary and private access within the subject property," Marx concluded that a four-percent decline in value was "reasonable" for the "adverse market reaction" to the loss of

11

privacy. Marx noted: "[M]aybe once or twice a month someone has to come in there, check everything. . . . [I]t wasn't going to be a daily kind of impact."

Appellant argues that Marx's "methodology in determining the reduction in value due to loss of privacy" was flawed because he took "no account of the loss of privacy due to the then existing lease [with Venoco and Exxon]." We disagree. "[L]iability [of a title insurer for nondisclosure of an easement] should be measured by diminution in the value of the property caused by the defect in title as of the date of the discovery of the defect, measured by the use to which the property is then being devoted." (*Overholtzer v. Northern Counties Title Ins. Co.*, *supra*, 116 Cal.App.2d at p. 130.)[3] In June 2008 when respondent discovered the defect, it intended to construct a single-family residence on the Property. To maximize the Property's value as a residence, a private entry is necessary. Pursuant to the easement, the only entry to the Property is shared in perpetuity with Pacific Lighting Service Company and its "successors and assigns." The lease allowed Venoco and Exxon to also use the entry to the Property, but the lease was due to expire in 2010. Since the date of valuation is June 2008, it is of no consequence that the lease was renewed two years later at a higher rent. Thus, Marx properly disregarded the lease in determining the decline in value caused by the loss of privacy resulting from the easement.

In calculating the dollar amount of the four-percent decline in value, Marx assumed that in June 2008 the market value of the Property without the easement was $18.8 million. This figure included $800,000 as the value of the lease that was due to expire in 2010. Appellant argues that the inclusion of the value of the lease "had the perverse effect of increasing the insured's loss due . . . to a lease which contributed as much or more to the loss of privacy as the easement. A more rational approach would

---

[3] *Overholtzer* is "the seminal case defining the measure of damages on a claim against a title insurer that fails to discover a recorded easement." (*Forman v. Chicago Title Ins. Co.* (1995) 32 Cal.App.4th 998, 1011.)

12

have been to credit the $800,000 against any loss of privacy going forward."  Appellant's argument is without merit.  Marx properly applied the four-percent decline in value against the full market value of the Property in June 2008, and the lease was an inextricable part of that value.

*Award of Prejudgment Interest*

The trial court awarded respondent interest on the $1.51 million in damages "at the rate of ten percent . . . per annum from June 2, 2011 (the day [respondent] submitted [its] Proof of Loss to [appellant])."  Appellant argues that, because respondent's claim for damages was unliquidated, "the date from which such interest runs may be no earlier than the filing of the action" on March 27, 2012.  The applicable statute is Civil Code section 3287, subdivision (b).  It provides that, if a plaintiff is entitled "to receive damages based upon a cause of action in contract where the claim was unliquidated," the plaintiff "may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."  Liquidated damages are "those which were certain by computation from the face of the contract, or which might be made certain by reference to well-established market values plus computation."  (*Lineman v. Schmid* (1948) 32 Cal.2d 204, 209-210.)

The parties dispute whether the applicable standard of review is substantial evidence or de novo review.  We need not resolve this dispute.  Under either standard of review, respondent's claim was unliquidated.  "Obviously, diminution of market value caused by the easement is not a fixed nor [*sic*] computable sum.  The evidence in the instant case demonstrates how difficult the ascertainment of that item may be.  For the reasons stated the demand is unliquidated within the meaning of the section [Civil Code section 3287] . . . ."  *Overholtzer v. Northern Counties Title Ins. Co.*, *supra*, 116 Cal.App.2d at p. 128.)  Thus, the date of the action's filing is the earliest date from which interest can run.

13

*Disposition*

The judgment is reversed insofar as it determined that, on the damage award of $1,510,000, respondent is entitled to prejudgment interest from June 2, 2011. Prejudgment interest did not begin to accrue until March 27, 2012, when the action was filed. The matter is remanded to the trial court with directions to amend the judgment accordingly. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

14

Donna D. Geck, Judge

Superior Court County of Santa Barbara

_____

James A Moss, Esq, Fidelity National Law Group, for Appellant.

Timothy J. Trager; Reicker, Pfau, Pyle & Mcroy, for Respondent.

15



DIX A

038/3

RA003



17