**John D. ALLISON, et al., and Bayfield Electric Cooperative, et al., Plaintiffs–Appellees,**

v.

**TICOR TITLE INSURANCE COMPANY, Defendant–Appellant.**

No. 89–3589.

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1990.

Decided July 16, 1990.

Rehearing Denied Aug. 10, 1990.

---

Barry Levenstam, Jerold S. Solovy, Jenner & Block, Chicago, Ill., John Cotter, Alan Kildow, Larkin, Hoffman, Daly & Lindgren, Minneapolis, Minn., John Cates, Lawton & Cates, Madison, Wis., for plaintiffs-appellees.

Joshua G. Vincent, William J. Holloway, William Swindal, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., Thomas A. Lockyear, Bell, Metzner, Gierhart & Moore, Madison, Wis., for defendant-appellant.

Before WOOD, Jr., and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Telemark Land Company built a recreational community in Cable, Wisconsin, near the Chequamegon National Forest. Including a lodge, houses, restaurants, ski trails, a fitness center, pools, tennis courts, a golf course, and convention facilities, the resort was designed for year-round occupancy. Telemark borrowed money for the construction, giving the lender a mortgage. It divided the lodge into 200 condominium "units" comprising leaseholds in particular rooms plus undivided ½% interests in the common areas of the lodge. Each lease runs for 52 years, with an option to renew for another 23. For between $27,000 and $29,500 per unit a purchaser obtained a right to occupancy and to participate in a rental arrangement: lessees could occupy their units when they pleased and ask the lodge to rent unoccupied units to guests. A rotation system ensured rough proportionality of returns.

The lodge opened in 1972. In 1978 Telemark and the lessees revised their arrangement. The lessees gave up the right to occupy particular units; all were put into a pool. Lessees were required to make reservations like anyone else and would not be assured of getting "their" units. Costs and revenues would be pooled, and the net disbursed pro rata. This arrangement, like the previous one—like the resort itself— was not entirely successful. Telemark Land Company and its affiliate Telemark Management Company filed for bankruptcy in 1981, unable to service the mortgage debt. By 1984 the lodge was rundown (it seems that the lessees did not fulfill their obligation to keep their units in tip-top shape, once they lost any sense that a unit was "theirs"), and business was off. Telemark's bankruptcy was converted that year from a Chapter 11 reorganization to a Chapter 7 liquidation.

Telemark's trustee in bankruptcy proposed to sell the lodge free of the leaseholds, on the ground that questions about the lessees' compliance with the repair obligations in their leases created a "genuine dispute" about the status of these leases. Such a procedure, authorized by 11 U.S.C. § 363(f)(4), allows the buyer to take free of encumbrances but requires the bankruptcy court to resolve the dispute and pay the lessees from the proceeds of the sale if their claims are valid. Many of the lessees protested. Some of the protesters got in touch with Ticor Title Insurance Co., which had written title insurance on their units. The unit owners' association tried to organize a bid for the lodge. After several rounds of negotiation and attempts at compromise, the trustee issued an additional notice, again requesting the bankruptcy judge to authorize a sale of the lodge free of the leases. Among the grounds stated in the trustee's notice was that "all said [lessees] do not have an ownership or possessory leasehold interest in the premises ... but are merely either equity investors in the Telemark Lodge and/or mortgage holders on said equity investment."

Owners of 18 leaseholds promptly tendered the defense of this claim to Ticor, reasoning that the trustee was saying that they never obtained good title but had been "equity investors" all along. Ticor had insured them against any defect in the title conveyed by Telemark and any event that made title "unmarketable". Ticor denied coverage and refused to defend them. Ticor made it clear to all that it would neither defend nor indemnify the lessees. The bankruptcy judge authorized the trustee to sell the lodge clear of the leases but did not make specific findings about the nature of the "genuine dispute" that clouded the lessees' interests. The proceeds of the sale paid off the mortgage (then some $13 million) and the administrative expenses of the bankruptcy. From the residue, each lessee received $1,250.

Holders of 98 leases then filed this diversity suit against Ticor to recover under their policies of title insurance. They maintained that the bankruptcy court must have concluded that they never acquired valid title, which had at all events become unmarketable. The district court conducted a jury trial, and the principal question put to the jury was whether the rotation and pooling agreements made the units "investment contracts" within the meaning of § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), which would require registration or an exemption as a condition to their sale. See *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). The premise of this question was that if the leases were unregistered securities, then the lessees did not get good title—or at least got unmarketable title. The jury concluded that the lease-plus-rental-pool was indeed an investment contract. After extended additional proceedings, the district judge entered judgment for some $2.6 million, representing the purchase price for each unit less the dividend received in bankruptcy.

The premise of the question put to the jury is that if the unit was an "investment contract", and thus a statutory "security", then the investors did not get good title. The premise is incorrect. Section 5 of the Securities Act, 15 U.S.C. § 77e, forbids selling a security in interstate commerce without registration or an exemption, and § 12, 15 U.S.C. § 77*l*, provides that the purchaser of a security sold in violation of § 5 may rescind the transaction. Nothing in either section implies that an unregistered sale does not pass title to the buyer. Section 12 gives the buyer a right to rescind the sale (a right to "put" the security to the seller within the period of limitations) without subtracting any entitlements under the law of property or contracts. Section 4(1) of the Act, 15 U.S.C. § 77d(1), reinforces this by exempting from registration "transactions by any person other than an issuer, underwriter or dealer". The exemption does not depend on proof that every earlier sale in the chain was lawful. Section 5 (the registration requirement) applies to transactions; each sale must be registered or exempt. A violation does not stick to the instruments like tar. It is a personal offense by the seller, leaving the validity of the securities as contracts between issuer and purchaser unaffected. Future sales may proceed if an exemption is available. See Thomas Lee Hazen, 1 *The Law of Securities Regulation* § 4.23 (2d ed. 1990) (discussing § 4(1)).

Leaseholds coupled with financial pooling may be securities, but the addition of a rental pool does not make the leasehold less an interest in real property. See *In re Owners of "SW 8" Real Estate*, 513 F.2d 558, 562 (9th Cir.1975). Imagine what would have happened had Telemark sent letters to the lessees a day after the expiration of the one-year statute of limitations in § 13, 15 U.S.C. § 77m, informing them that because the combination of a lease and rental pool is a security, the lease is invalid, and the lessees' demands for occupancy (and a share in the receipts) would no longer be honored. It would take a state court but a few minutes to issue an injunction restoring the lessees' right of occupancy. Claims under their contract against the issuer are fully enforceable, and because of § 4(1) their interests are freely transferra-

ble. Any violation of § 5 therefore does not negate the existence of title.

Perhaps the best argument for the lessees would be that their leaseholds are unmarketable because a subsequent purchaser could sue them under the securities laws, as in *Hocking v. DuBois*, 885 F.2d 1449 (9th Cir.1989) (in banc). We have grave doubts about the correctness of *Hocking*, a 6–5 decision that did not satisfactorily address the question how a unit owner who conveys only an interest in real property vends a "security" just because the proprietor of the condominium development offers a rental pool in which unit owners may participate if they choose. The proprietor conveys the full package and hence a "security" to the original owner, who cannot re-convey the same package (or for that matter stop the proprietor from offering a rental pool). Yet even if we were to follow *Hocking* the leases would not be "unmarketable". Liability in *Hocking* was based not on the unit owner's failure to register under § 5 (something that § 4(1) makes unnecessary) but on a claim that the unit owner defrauded the person to whom he sold. *Hocking* used the securities laws to transfer a claim of fraud from state to federal court without changing the nature of the liability. Rules against fraud are universal; an interest in land is not less "marketable" if, because of the securities laws, the victim has access to a federal forum in addition to a state court.

■ This conclusion does not save the day for Ticor, however, because of its failure to defend its insureds in the bankruptcy action. After the trustee proposed to extinguish the lessees' interests, 18 of them explicitly tendered the defense to Ticor, which refused. The trustee's notice put the existence of title into question, activating the obligation to defend. Ticor now says that it did not need to defend because the trustee's notice did not explicitly state that he was questioning the validity of title. Although it is possible to construe the notice as an argument that the leases should be recharacterized as security interests and subordinated to other debts rather than invalidated, it is also possible to read the notice as a contention that the lessees never obtained title of any kind. In a system of notice pleading, an insurer may be called on to defend without a complete articulation of the claim against its policyholders. A complaint raising a question about title need not detail the reasons; the trustee's notice raises a question about title that comes squarely within Ticor's policy. Ticor's argument that the trustee's sketchy notice would not have been sufficient in a Wisconsin court to notify it that a question of title is at stake is beside the point. Wisconsin may, if it wishes, require elaborate pleading of fact and law; the bankruptcy rules, which largely incorporate the Federal Rules of Civil Procedure, do not require the pleader to spell out its claim. In a system of notice pleading, the trustee's filing gave adequate notice of a dispute about whether the leaseholders acquired in 1972, or possessed in 1985, marketable title to their units. Ticor had to defend them, or at a minimum seek clarification of the trustee's notice or a declaratory judgment that the claim was outside the policy. It did none of these things.

■ Ticor insists that exclusion 3(a) to its policy absolves it. Section 3(a) says that the policy does not cover defects created or suffered by the insureds, which Ticor believes fits this case like a glove. Yet the duty to defend is broader than the coverage of a policy itself, in large measure because it may be unclear on the basis of the pleadings just what the adverse party will be able to establish. It may be that, once fleshed out, the trustee's contentions would have come within exclusion 3(a). But Ticor did not see to it that the contentions were made concrete. As things stood when Ticor refused to defend, the trustee was making a contention within the policy's coverage, and not plainly within one of its exclusions. We therefore shall not decide whether § 3(a) would apply, because in Wisconsin an insurer's refusal to defend when a defense is necessary forfeits any opportunity to rely on policy exclusions. *Professional Office Buildings, Inc. v. Royal Indemnity Co.*, 145 Wis.2d 573, 427 N.W.2d 427 (Wis.App.1988). Ticor con-

tends that *Professional Office Buildings* is wrongly decided and in any event should not apply retroactively to a refusal to defend in 1985. Unfortunately for Ticor, we anticipated *Professional Office Buildings* in *American Motorists Insurance Co. v. Trane Co.,* 718 F.2d 842 (7th Cir.1983), affirming and adopting 544 F.Supp. 669 (W.D.Wis.1982). *Professional Office Buildings* holds that *American Motorists* states the law of Wisconsin. Our decision, two years before Ticor refused to defend its insureds, takes any question of "retroactivity" out of the case. Although Ticor disagrees with these decisions, we are not disposed to overrule our interpretation of Wisconsin law after a state court has concluded that we are right.

■ A case such as this shows the value of giving an insurer a strong reason to defend. The bankruptcy court had at least six options: (a) to hold that no title passed because the package was a security; (b) to recharacterize the transaction as a loan to Telemark plus a security interest; (c) to find that the leaseholders abandoned their title via novations in 1978; (d) to find that the leaseholders breached the covenant of repair, so that the leases could be cancelled; (e) to find that the leases were valid and would pass through bankruptcy unimpaired; or (f) to find that the leases were valid but that they would be liquidated and paid in cash.. The differences among these options may have been substantial for both the lessees and Ticor. The bankruptcy judge's brief opinion after the hearing on the trustee's notice did not yield a definitive conclusion. It said, "[f]or the purposes of this hearing only", that there was a bona fide dispute about two questions: whether the lessees had forfeited their interests by violating their covenants to repair the units, and whether the lessees "have in fact purchased equity investments in Telemark Lodge" rather than possessory interests. The court did not revisit the question after the sale, so we shall never know how the bankruptcy judge would have resolved these "bona fide disputes".

Ticor essentially insists that the bankruptcy court could not have denied the existence of the lessees' *title* without making a horrible mistake. Perhaps so, but one reason for obtaining a policy of title insurance is to secure a champion who will draw facts and law to the court's attention and prevent such mistakes. Ticor's argument that its insureds were in no danger so long as the bankruptcy judge followed the law did not excuse it from appearing to help the bankruptcy judge do so. Ticor did not appear, and the lessees' interests were indeed extinguished. Its failure to litigate means that we shall never know whether the bankruptcy judge believed that there was a defect in the title, that the lessees had breached a covenant, or that their titles were intact but worth no more than $1,250 given the hard times on which Telemark had fallen. Under *Professional Office Buildings* an insurer is not entitled to stand on the sidelines during the main event and then insist that a clause in the policy would have excused it from indemnifying had the original action been correctly decided.

■ Only 18 policyholders tendered their defense to Ticor, which insists that even under *Professional Office Buildings* it may stand on its policy defenses with respect to the remaining 80. The district judge rejected this submission. So do we, for two reasons. First, the policy does not contain a tender requirement. Section 3 says that Ticor "shall defend" its insureds; it does not require formal tender as a condition to defense. Notice is necessary, but notice Ticor had. (Actually, it is not even so clear that notice was necessary. Section 3(b) says that "failure to notify shall in no case prejudice the rights of any such insured", unless lack of notice has caused prejudice to Ticor.) If Ticor appears, the insureds shall "secure" to Ticor the control of the defense, but this language does not imply formal tender. It means only that the insureds must move over, must cede control to Ticor. Tender is necessary and appropriate when the insured has an option and may put on its own defense (controlling its own strategy) or turn things over. Section 3(b) of this policy appears neither

to contemplate a formal demand from the insureds nor give them any option to say nay when the insurer appears.

Second, Ticor made it crystal clear to all who tendered or inquired that it would not defend. A more formal request would have been a futile gesture. See *Cooper v. Insurance Co. of Pennsylvania,* 96 Wis. 362, 367, 71 N.W. 606, 608 (1897). A "tender" is a formal invitation coupled with an undertaking to abide by the insurer's strategy. Only the latter element is potentially important for the 80 who did not tender. Although a vow of submission to the insurer's tactics might make a difference in some cases—when, for example, the insureds want to compromise and the insurer to fight, or the reverse—the owners of these 98 leaseholds wanted a legal defense. They put on a feeble one for themselves in Ticor's absence, apparently even at the expense of undercutting the lessees' bidding syndicate. (Ticor sees this as an opening, submitting that a conflict among the lessees relieved it of the duty to defend. But defending the validity of the leases would not have blocked a bid by the unit owners' association. At all events, Ticor could have hired independent counsel to defend the interests of its policyholders who wanted to be defended.)

■■■■■ Damages are the principal remaining question. The judge disbanded the jury once it found that the units were securities, believing that as a matter of law the lessees' remedy is reimbursement for the attorneys' fees incurred in bankruptcy court. Later persuaded that this was mistaken, the judge set the case for a second trial on damages. Before beginning this trial, however, the judge concluded that there was no disputed question of material fact. The parties stipulated the policy limits, which equalled the purchase prices of the leaseholds. After concluding that an insurer who is forbidden (because of failure to defend) to invoke policy defenses is liable for the policy limits, the district judge entered judgment in the full amount of the purchase price for each leasehold, less the bankruptcy dividend, plus prejudgment interest. Here we part company with the district court.

*Professional Office Buildings* establishes that an insurer that refuses to defend its insured is liable *up to* the policy limits, not *for* the policy limits. A physician who purchases a malpractice policy with a $5 million limit, and suffers a $1 million judgment in a case the insurer refuses to defend, may recover the $1 million (the insurer is estopped to deny either the validity or the amount of the judgment); he does not get $5 million. We need to know how much the insureds lost because of what we must assume (given the failure to defend) was a defect in their title covered by the policy. Section 6(a) of the policy provides that the insured is entitled to the lesser of "the actual loss of the insured claimant" or "the amount of insurance". No judgment against them in the bankruptcy case establishes the amount of their loss. Although the lessees believe that "actual loss" equals the purchase price of the leaseholds, this is not at all clear.

It is hard to see how "actual loss" could exceed market value on the date of the loss. What could the lessees have obtained for their interests in the absence of any question about the validity of title? In 1985 the unit owners had leases with 39 years to go in a run-down lodge burdened with a $13 million secured loan that came ahead of their interests. A decline in the value of the units between 1972 and 1985 cannot be attributed to a problem in *title*. The unit owners' "actual loss" is no greater than the price such interests would have fetched if unimpaired.

Although the plaintiffs maintain that Wisconsin requires a title insurer to pay more than the market value of the real property on the date title is divested, no case so holds. *Blackhawk Production Credit Ass'n v. Chicago Title Insurance Co.,* 144 Wis.2d 68, 423 N.W.2d 521 (1988), the most recent (apparently the only) case on the subject in Wisconsin, acknowledges that contractual language limiting recovery to actual loss will be enforced. *Blackhawk* is not precisely on point because it involved a mortgagee's interest; still, it is noteworthy that the Supreme Court of Wisconsin went through a complex chain of calculations to determine the insured's actual loss

and favorably quoted *Atlanta Title & Trust Co. v. Allied Mortgage Co.*, 64 Ga. App. 38, 40, 12 S.E.2d 147, 149 (1941), which said that the insurable interest is the "fair market value of the realty ... and is not controlled by the original purchase price".

Plaintiffs acknowledge that they are entitled to no more than the fair market value of their interests; they are content to ask us to measure those interests as of the purchase date, when (Ticor concedes) the fair market value equalled the purchase price. But why should the value in 1972 matter, when the lessees enjoyed possession and rentals for 13 years? Requiring Ticor to pay the price as of 1972 would effectively mean that the plaintiffs were squatters for 13 years; presumably, then, they would be required to pay Ticor the fair rental value of the property during that time. This is the standard adjustment in rescission cases under the securities laws: the investor recovers the purchase price "less the amount of any income received thereon", § 12. Plaintiffs obtained two kinds of benefits during the 13 years they exercised dominion: the rental payments they did not need to make (having prepaid for 52 years' occupancy), and the proceeds of the rental pool. In principle a judge might require Ticor to pay the purchase price and then subtract these benefits received, but after jumping through these hoops the court ought to end up with the market price in 1985. Why not go there directly, instead of making a series of complex, hard-to-calculate adjustments to the value as of 1972? An insurer pays the depreciated, not the original, value of a car destroyed in a collision or a house burned to the ground (unless the owner buys a replacement-value policy at an extra price). Similarly the "actual loss" for the leaseholders was the depreciated value of the leaseholds. They get no more from Ticor than they would have obtained from their casualty insurer had Telemark Lodge been the victim of a forest fire.

Although confident that this is the most sensible meaning of "actual loss", we recognize that the law is thin—nonexistent in Wisconsin, scant elsewhere. The leading treatise, D. Barlow Burke, Jr., *Law of Title*

*Insurance* § 10.1 (1986), reports only that the remedy in the event of total failure of title is "the fair market value of the estate ... that was purported to be conveyed, always ... subject to the policy requirement that actual loss be shown." Plaintiffs ask us to read this and like expressions in some cases as referring to the market value on the date of the conveyance, but we cannot see why, and Professor Burke would be unlikely to accept the proposition. He discusses the question of the appropriate valuation date in § 10.4 when discussing partial failure of title. After pointing out that courts have used at least five different dates, Professor Burke endorses use of the date on which the defect was discovered, *id.* at pp. 342–43, relying particularly on *Hartman v. Shambaugh*, 96 N.M. 359, 630 P.2d 758 (1981). See also *Sullivan v. Transamerica Title Insurance Co.*, 35 Colo.App. 312, 532 P.2d 356 (1975); *Overholtzer v. Northern Counties Title Insurance Co.*, 116 Cal.App.2d 113, 253 P.2d 116 (1953). Choosing a date may be difficult if there is a substantial gap between the identification of a potential defect and final judgment. Who bears the risk of loss (or reaps the gain) if market value changes in the interim? We need not decide, because none of the parties has suggested that the market value changed between, say, the date of the trustee's notice and the sale more than a year later. For now it is enough to say that market value in 1985 or 1986, and not the purchase price in 1972, is what the leaseholders actually lost. It may well be that the $1,250 paid in bankruptcy is the best evidence of value in 1986 (the lodge was sold in an arm's length transaction, after all), so that damages are zero; yet we do not know how this sum was determined. The sale establishes the price of the *lodge*, but not of units within it. The district judge needs to determine how much the units were worth, which may be greater or less than $1,250.

■ Our conclusion concerning the date on which to measure plaintiffs' loss casts in a new light all questions concerning prejudgment interest. It also sheds additional light on the question whether Ticor should have been sanctioned for demanding a jury trial on damages notwithstanding its stipu-

lation to the market value of the units in 1972. The district court imposed sanctions not only on Ticor but also on its lawyers. Because the lawyers did not identify themselves in the notice of appeal, they have not properly invoked our jurisdiction. *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988); *Rogers v. National Union Fire Insurance Co.*, 864 F.2d 557 (7th Cir.1988).

To sum up: Ticor was required to defend the lessees in the bankruptcy court. Its failure to do so means forfeiture of its argument that an exclusion in the policy applies. We therefore hold that Ticor is liable, even though we disagree with the district court's conclusion that the securities laws extinguished the lessees' title. The judgment is vacated, however, to permit further proceedings concerning damages. The award of sanctions against Ticor is vacated and should be reconsidered; the attorneys' appeal from the award of sanctions against them personally is dismissed for want of jurisdiction. Circuit Rule 36 shall not apply on remand.