Filed 6/28/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARTIN TAIT et al., <br><br>    Plaintiffs and<br>    Appellants, <br><br> v. <br><br> COMMONWEALTH LAND TITLE INSURANCE COMPANY, <br><br>    Defendant and<br>    Respondent. | A166676 <br><br> (Contra Costa County Super. Ct. No. MSC19-02313) |

Plaintiffs Martin Tait, Jane Tait, and Bry-Mart, LLC (collectively, the Taits) sued Commonwealth Land Title Insurance Company (Commonwealth) for breach of a title insurance policy and alleged that Commonwealth failed to pay the full amount by which their property's value was diminished due to an undisclosed easement. The trial court granted Commonwealth's motion for summary judgment, ruling that the policy required Commonwealth to compensate the Taits only for the value of their actual use of the property as a vacant residential lot suitable for only one home rather than its highest and best use as a subdividable lot. We agree with the Taits that the policy entitles them to reimbursement for the diminution in value of their property based on its highest and best use. As a

1

result, the Taits' evidence of the likelihood of subdivision and the value of a subdividable lot created a triable issue of fact regarding the amount of the Taits' loss under the policy, thereby precluding summary judgment. We will therefore reverse.

## BACKGROUND

In 2016, the Taits purchased a residential property in Danville for $1.25 million. Commonwealth issued the Taits an American Land Title Association (ALTA) Homeowner's Policy of Title Insurance for the property. The policy insures the Taits against "actual loss" arising from certain defined covered risks, which include someone else having an easement on the property.

The policy limits Commonwealth's liability for an unknown easement to the lesser of the Taits "actual loss" or the policy limit of $1.25 million. The policy does not define "actual loss." The policy excepts from coverage certain building and subdivision restrictions recorded by the Town of Danville (town) and a recorded irrevocable offer of dedication of a drainage easement. The building restrictions prohibit further subdivision of the property and the construction of any building within the area of the offered drainage easement.

As they had intended upon purchasing the property, the Taits proceeded with plans to subdivide the property into two lots. Between May 2016 and February 2017, the Taits engaged in informal talks with the town's development services coordinator, Fred Korbmacher, about their proposed subdivision. The town's staff recommends applicants engage in such talks prior to a

formal application, to determine whether the staff will support the application.

The town could eliminate or modify the offer of dedication of the drainage easement and building restrictions to permit the subdivision. The town's staff were supportive of the Taits' subdivision plan. Staff support is not a guarantee that an application will be approved, but according to Korbmacher, it is "very, very rare" that the town's planning commission or town council does not approve a subdivision that the staff supports. Korbmacher therefore believed that if the Taits had submitted an application, the town most likely would have approved the subdivision. At the end of 2016, the Taits had a complete application for a tentative map, ready for submission. But the Taits never submitted a formal subdivision or tentative map application.

On February 10, 2017, the Taits learned about a separate 1988 maintenance easement covering the same area as the drainage easement. The Taits believed the maintenance easement would impact the marketability and value of property and interfere with its potential development, so they tendered a claim on the policy to Commonwealth. Commonwealth accepted coverage.

Commonwealth obtained an appraisal from AGI Valuations to calculate the property's diminution in value resulting from the maintenance easement. AGI Valuations stated that it applied the standard in *Overholtzer v. Northern Counties Title Ins. Co.* (1953) 116 Cal.App.2d 113 (*Overholtzer*) and analyzed the highest

3

and best use of the property on the date of loss. This appraisal assumed that it was reasonably likely the town would extinguish the building restrictions and the offer of dedication of the drainage easement. It also assumed that the maintenance easement prohibited development within its area. AGI Valuations determined that the value of the property without the maintenance easement as of February 10, 2017, was $1.3 million, and with it was $1.1 million, for a diminution in value of $200,000.

Commonwealth asked AGI Valuations to revise the appraisal by omitting the assumptions that the town would extinguish the offer of dedication of the drainage easement and the building restrictions and that the maintenance easement prohibited development within its area. AGI Valuations prepared a revised appraisal stating, as it had before, that it applied the *Overholtzer* standard and omitting those assumptions. AGI Valuations' second appraisal concluded the value of the property without the maintenance easement as of February 10, 2017, was $1.3 million, and with it was $1,256,500 million, for a diminution in value of $43,500. Commonwealth sent the Taits a check for $43,500.

The Taits obtained their own appraisal from Valbridge Property Advisors (Valbridge). Like both of AGI Valuations' appraisals, Valbridge said it computed the property's diminution in value pursuant to *Overholtzer*. Valbridge said there was a high probability that without the maintenance easement the Taits could expunge the building restrictions and offer of

4

dedication of the flood control easement and could subdivide the property into two developable lots. Valbridge therefore valued the property without the maintenance easement as two separate developable parcels. With the maintenance easement, the property could not be subdivided into two developable lots, so Valbridge valued it as a single parcel. Valbridge determined that the value of the property without the maintenance easement as of February 10, 2017, was $2.08 million, and with it was $1.38 million, for a diminution in value of $700,000.

The Taits provided Commonwealth a copy of the Valbridge appraisal and requested that it pay the $656,500 difference between Valbridge's calculation of diminution in value and the $43,500 Commonwealth had already sent. Commonwealth denied their request. The Taits filed suit, and their operative complaint alleged a single cause of action for breach of contract. The trial court granted Commonwealth's motion for summary judgment, ruling, as relevant here, that there was no triable issue of material fact about whether Commonwealth breached the policy by paying the Taits the $43,500.[1] The court reasoned that the legal standard for title insurance losses did not permit consideration of a property's highest and best use, only its actual use as vacant residential land. The trial court therefore disregarded the Taits' appraisal based on the property's highest and best use and found Commonwealth's appraisal was the only

_____

[1] The trial court also ruled that Commonwealth did not breach the policy in other ways the Taits alleged in their operative complaint. The Taits do not challenge these rulings, so we do not discuss them.

5

evidence of the Taits' losses. The trial court entered judgment for Commonwealth.

## DISCUSSION

### I. Standard of review

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.] Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)[2]

---

[2] Commonwealth asserts that there is a split of authority over whether a trial court's rulings on objections to summary judgment evidence are reviewed de novo or for abuse of discretion. (See *Lopez v. American Medical Response West* (2023) 89 Cal.App.5th 336, 343 ["there is some question as to whether a de novo standard should apply to evidentiary rulings made solely on summary judgment papers"]; *Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640, 657 [weight of authority supports abuse of discretion standard].) Neither party contends the trial court erred in its rulings on the parties' evidentiary objections to the summary judgment evidence, so any uncertainty over the standard of review of such objections is irrelevant.

## II.    Owner's actual loss under title insurance policy

"Title insurance 'is a customary incident of practically every California real estate transaction,' including a sale or refinancing. [Citations.] Title insurers insure 'the record title of real property for persons with some interest in the estate, including owners, occupiers, and lenders.' [Citation.] A title insurance policy is not a guarantee as to the state of the property's title. [Citations.] It instead offers indemnification to the insured against many losses arising from title defects not disclosed in the title policy or report, as well as errors by the entity performing the title search. [Citations.]

"Title insurance differs in some respects from other forms of insurance. While most other forms of insurance provide protection against future loss, title insurance instead relates to the past; it protects against undisclosed encumbrances and defects in title that exist at the time the policy is issued. [Citations.] Thus, rather than requiring periodic, ongoing premiums to obtain continuing future coverage, title insurance requires a one-time payment [citation] compensating for the risk assumed and the services rendered in connection with researching and preparing the policy [citation]." (*Villanueva v. Fidelity National Title Co.* (2021) 11 Cal.5th 104, 112–113.)

The trial court ruled there was not a triable issue of material fact about whether Commonwealth's $43,500 payment completely discharged its duty under the policy to indemnify the Taits for their losses on the property. The propriety of this ruling hinges, in the first instance, on what losses the policy covers. The

7

Taits' policy requires Commonwealth to indemnify them for their "actual loss" resulting from a covered risk, up to the policy limit of $1.25 million. The policy does not define "actual loss," but the Taits and Commonwealth agree that *Overholtzer* established that an owner's actual loss when there is a cloud on title is measured by the diminution in market value caused by the existence of the cloud.[3] However, they disagree over what *Overholtzer* has to say about how to calculate the depreciation in market value. We therefore begin by reviewing *Overholtzer* to determine whether it answers the question of how to calculate diminution in market value and therefore what losses are compensable under the Taits' policy.

## III. Overholtzer

The plaintiffs in *Overholtzer* bought a property and obtained a title insurance policy protecting them against " 'all loss or damage' " that they might sustain by reason of " 'any defect in, lien or encumbrance on' " the title to the property. (*Overholtzer*, *supra*, 116 Cal.App.2d at p. 117.) The maximum benefit under the policy was $3,000, the amount the plaintiffs paid for the property. (*Id.* at pp. 117, 121.) When they bought it, the property was agricultural land. (*Ibid.*) The plaintiffs built a lumber mill on the insured property. (*Id.* at p. 118.)

---

[3] Commonwealth acknowledges that other forms of damages are recoverable in different circumstances, such as rent lost because of a defect in title. (*Nebo, Inc. v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 222, 227.) The Taits have not sought to recover damages under any theory other than diminution in value, so we need not consider other possible theories.

8

The policy failed to note a water pipe easement on the property.  (*Overholtzer*, *supra*, 116 Cal.App.2d at p. 117.)  The plaintiffs and the owners of the easement got into a dispute about the easement.  (*Id.* at p. 118.)  At about the same time that the mill went into operation, the plaintiffs learned the easement existed and was valid.  (*Id.* at p. 118.)  They then sued the insurer for the damages caused by the easement.  (*Id.* at p. 116.)  The trial court determined that the easement caused a $15,000 diminution in value of the property and improvements but disallowed any recovery for this amount.  (*Id.* at pp. 121–122.)  The trial court instead awarded the plaintiffs $1,000, which was the difference between the $3,000 they had paid for the property and the $2,000 value of the property for agricultural purposes with the easement on the date of purchase.  (*Id.* at p. 121.)

The Court of Appeal held this was error.  (*Overholtzer*, *supra*, 116 Cal.App.2d at pp. 129–131.)  It stated that the measure of damages was "the depreciation in market value caused by the existence of the easement."  (*Id.* at p. 128.)  It then considered whether this diminution in value should be calculated "at the time of purchase, market value being measured by the use to which the property is then devoted," or whether it should be calculated "as of the time of the discovery of the defect measured by the use to which the property is then being used."  (*Id.* at p. 130.)  The court concluded, "It seems quite apparent to us that liability should be measured by diminution in the value of the property caused by the defect in title as of the date of the discovery of the defect, measured by the use to which the

9

property is then being devoted. When a purchaser buys property and buys title insurance, he is buying protection against defects in title to the property. He is trying to protect himself then and for the future against loss if the title is defective. The policy necessarily looks to the future. It speaks of the future. The present policy is against loss the insured 'shall sustain' by reason of a defect in title. The insured, when he purchases the policy, does not then know that the title is defective. But later, after he has improved the property, he discovers the defect. Obviously, up to the face amount of the policy, he should be reimbursed for the loss he suffered in reliance on the policy, and that includes the diminution in value of the property as it then exists, in this case with improvements. Any other rule would not give the insured the protection for which he bargained and for which he paid." (*Ibid.*)[4]

The trial court here, at Commonwealth's urging, read *Overholtzer* as requiring it to assess the diminution in value of the Taits' property measured by the property's use on the date the Taits discovered the easement, which was vacant residential land suitable for only one home. The Taits argue that *Overholtzer* established only that the measure of damages is the depreciation in market value caused by the defect in title, and

---

[4] The 2021 revision of the ALTA form title insurance policy now specifies, consistent with *Overholtzer*, that an insured's losses will generally be calculated as of the date of discovery of the title defect. (See Akawie et al., Cal. Title Insurance Practice (Cont.Ed.Bar 2d ed. 2023) Structure and Coverage of Title Insurance Policy Forms, § 6.95.)

10

then addressed the date on which that depreciation should be determined, selecting the date of discovery of the title defect. According to the Taits, *Overholtzer* did not address how to determine a property's market value, so the market value must be determined based on a standard appraisal that considers the property's highest and best use, meaning the most profitable use to which the property might be put in the reasonably near future. We agree with the Taits that *Overholtzer* does not address how to calculate a property's market value and does not foreclose the use of the highest and best use standard.

*Overholtzer*'s language merges two separate valuation concepts, the date of valuation and the use being valued. This appears to have been a function of the facts of the case. When the title defect was discovered, the plaintiffs were already using the property at the higher level, as a lumber mill. (*Overholtzer*, *supra*, 116 Cal.App.2d at p. 118.) There was no suggestion that the property was suitable for any use higher than the lumber mill. Thus, answering the timing question also answered the use question. The parties apparently did not consider whether the property could have been valued based on the potential for the higher industrial use as of the date of purchase, likely because the plaintiffs wanted the higher value as developed land as of the date of discovery of the defect and the insurer wanted the lower value of actual use on date of purchase. *Overholtzer* therefore had no reason to discuss whether the property should have been valued according to its highest and best use, much less to reject that standard. (*Helms v. Old Republic National Title Insurance*

11

*Company* (D.Neb., Jan. 11, 2018, No. 4:16-cv-3010) 2018 WL 718426, at *4 (*Helms*) [*Overholtzer* "did not expressly reject the highest and best use standard," citing Palomar, Title Insurance Law (24th ed. 2017) § 10:17]; 1 Palomar, Title Insurance Law (30th ed. 2023) Recovery Under Title Insurance Policy, § 10:17 [*Overholtzer* "was NOT a rejection of the 'highest and best use' measure because the industrial use to which it was being devoted on the date the title defect <u>was</u> discovered was a higher and more valuable use than its agricultural use on the policy date that the title insurer had proposed"].) The language in *Overholtzer* describing the measurement of damages on the date of discovery "by the use to which the property is then being devoted" or "as it then exists" must be interpreted in the context of the narrower timing question the court was answering. (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1153 [" 'an unnecessarily broad holding is "informed and limited by the fact[s]" of the case in which it is articulated' "]; *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043 ["It is axiomatic that cases are not authority for propositions that are not considered"].)

On appeal, Commonwealth candidly admits that *Overholtzer* is not a case about appraisal methodology and did not adopt any specific methodology of appraising properties to calculate diminution in value. But Commonwealth nonetheless argues that *Overholtzer*'s resolution of the date of valuation precludes consideration of a property's highest and best use when valuing a property. Commonwealth reasons that when a

12

property's existing use is not the highest and best use, considering the possibility of achieving that highest and best use in the future makes the date of discovery all but meaningless.

This argument improperly merges the separate concepts of the date of valuation and the use being valued. (Cf. Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar. 3d ed. 2023) Just Compensation, §§ 4.9–4.21 [discussing determination of highest and best use in context of eminent domain], 4.22 [discussing effect of date of valuation in eminent domain cases].) A property's value for any given use can and does change over time, sometimes dramatically over short periods of time, due to external market factors such as financing costs, supply of similar properties, and changes in demand. (E.g., *Saratoga Fire Protection Dist. v. Hackett* (2002) 97 Cal.App.4th 895, 898, 905–906 [in eminent domain action, trial court erred in excluding evidence that property increased in value by over 50 percent in 10 months from December 1999 to October 2000].) Establishing the date of valuation controls for the influence of such factors on the calculation of an insured's losses. Conversely, on any given date a property can have different values for the different uses of which it is capable, as the appraisals in this case suggest. Valuing a property based on its highest and best use does not make the date of valuation meaningless, nor does selecting the date of valuation make it unnecessary to consider different uses of which a property is capable.

Commonwealth contends that numerous courts across the country have adopted and applied its understanding of

13

*Overholtzer*. However, as the Taits point out, the cases Commonwealth cites merely agreed with *Overholtzer*'s statement of the diminution in value measure of damages or that a property should be valued as of the date of discovery. (*Hartman v. Shambaugh* (N.M. 1981) 630 P.2d 758, 762–763 [date of valuation]; *Happy Canyon Inv. v. Title Ins. Co. of Minn.* (Colo.Ct.App. 1976) 560 P.2d 839, 843 [general standard]; *Allison v. Ticor Title Ins. Co.* (7th Cir. 1990) 907 F.2d 645, 652 [date of valuation]; *Swanson v. Safeco Title Ins. Co.* (Ariz.Ct.App. 1995) 925 P.2d 1354, 1357–1359 [general standard and date of valuation, in dicta].) None of these cases viewed *Overholtzer* as precluding consideration of a highest and best use method of measuring the depreciation of a property's value.

## IV. Highest and best use

Our determination that *Overholtzer* is not dispositive here still leaves us with the question of whether the Taits' "actual loss" under their title insurance policy should be measured based on the value of their property's highest and best use or merely its current use. "The principles governing the interpretation of insurance policies in California are well settled. 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If contractual language is clear and explicit, it governs." [Citations.] If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' " [Citation.] Only if these rules do not resolve a claimed ambiguity

14

do we resort to the rule that ambiguities are to be resolved against the insurer.' " (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321; *Havstad v. Fidelity National Title Ins. Co.* (1997) 58 Cal.App.4th 654, 659–660 [applying insurance policy interpretation rules to title insurance].)

Again, the title insurance policy is of little help because it does not define "actual loss." Commonwealth's and the Taits' two different approaches to measuring the diminution in a property's value are reasonable, so the term "actual loss," even as construed in *Overholtzer*, is ambiguous. (*Minkler v. Safeco Ins. Co. of America*, *supra*, 49 Cal.4th at p. 321.) We must therefore interpret it in line with the Taits' objectively reasonable expectations. (*Ibid.*) We agree with the Taits that a property's market value is generally based on its highest and best use, as is established in eminent domain law.[5] (See *Bohr v. First Am. Title Ins. Co.* (M.D.Fla., July 30, 2008, Nos. 3:07-cv-741-J-32MCR, 3:07-cv-745-J-32HTS) 2008 U.S. Dist. Lexis 111191 at *22–*23 & fn. 13, *30–*32 [2008 WL 2977353, at *6–*7 & fn. 13, *9] [under Florida law, considering a property's highest and best use in title insurance dispute based on analogy to eminent domain law]; accord, *Regions Bank v. Chi. Title Ins. Co.* (S.D.Fla., Feb. 22, 2011, No. 10-cv-80043-RYSKAMP/VITUNAC) 2011 U.S. Dist. Lexis 17113, at *11–*14 [2011 WL 709853, at *4–*5] [following *Bohr* and relying on expert's opinion of highest and best use].)

---

[5] We could also reach the same outcome here by construing the ambiguity in the definition of "actual loss" against Commonwealth as the insurer. (*Minkler v. Safeco Ins. Co. of America*, *supra*, 49 Cal.4th at p. 321.)

When the government takes private property, " '[t]he fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available.' " (*City of Perris v. Stamper* (2016) 1 Cal.5th 576, 598–599.)  As this definition indicates, " 'the fair market value of property taken has not been limited to the value of the property as used at the time of the taking, but has long taken into account the "highest and most profitable use to which the property might be put in the reasonably near future, to the extent that the probability of such a prospective use affects the market value." ' " (*Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954, 965.)[6]

---

[6] Commonwealth cites *City of Ontario v. Kelber* (1972) 24 Cal.App.3d 959, 968 for the proposition that evidence of a specific scheme of development is inadmissible in eminent domain cases.  Commonwealth's reliance on *Kelber* is misplaced. *Kelber* involved the principle that "a jury is precluded from including in an eminent domain award *any* increase in value to the owner's property attributable to the proposed improvement, i.e., project enhanced value." (*Id.* at p. 965.)  *Kelber* held the trial court properly excluded evidence of the City's future use of the taken property because the proffered evidence failed to show that the plaintiff's evidence of the property's value improperly included project-enhanced value.  (*Id.* at p. 966.)  *Kelber* did not hold that evidence of the highest and best use of the taken

16

We need not decide whether valuation principles in eminent domain law apply wholesale to the title insurance context, or even whether all aspects of this specific definition of fair market value apply. (See, e.g., 7 Miller & Starr, Cal. Real Estate (4th ed. 2024) Eminent Domain, § 24:22 [noting that appraisals typically consider the most probable price that a property would sell for, while eminent domain valuation is based on the highest price].) But we see no reason why a property should be valued for different uses based on whether an insurance company or the government is compensating the owner for its value. If, as Commonwealth would have it, only the current use matters, a buyer who pays a premium for a developable property and has such development potential destroyed by a title defect would not receive any compensation for what was lost. Because the title insurance policy requires compensation for "actual loss," the policy should compensate for any such harm, even if the property could continue to be used for its existing use. (*Helms*, *supra*, 2018 WL 718426, at *4 [valuing property based on highest and best use as land with pivot irrigation after owners installed pivot irrigation system but had to remove it due to title defect].)

_____

property in the absence of the project was inadmissible. The project enhancement rule discussed in *Kelber* simply holds that "when assessing fair market value (including its highest and best use and the reasonable probability of a zoning change), any increase or decrease in the property's value *caused by the project for which the property is condemned* may not be considered." (*City of San Diego v. Barratt American, Inc.* (2005) 128 Cal.App.4th 917, 934.)

17

Putting aside *Overholtzer*'s loose language, that decision's reasoning and outcome are consistent with considering a property's highest and best use. (*Helms*, *supra*, 2018 WL 718426, at \*4.) *Overholtzer*'s rationale for valuing a property as of the date of discovery was that title insurance by its nature protects against future losses and owners should be reimbursed for additional losses they suffer in reliance on the policy after it took effect. (*Overholtzer*, *supra*, 116 Cal.App.2d at p. 130.) *Overholtzer*'s concern with future losses based on existing title defects applies just as much to the loss of the ability to develop after the date of the policy as to the loss of an actual development. And a property owner who pays a premium for a developable property has invested money in reliance on the title insurance policy, regardless of whether the owner intends to develop the property personally or merely buys the property with the expectation that the development potential will cause the property value to increase over time. The loss of the potential to achieve a property's highest and best use presents a smaller magnitude of loss than a completed building or other improvement like in *Overholtzer*, but the nature of the insured's expectations and reliance interests is similar.

Commonwealth equates the highest and best use approach with awarding compensation for speculative uses of a property. It further argues that valuing a property based on the highest and best use is contrary to the rule that title insurance only compensates for actual losses, not possible or probable ones, and could lead to different valuations of the same property for

18

different insureds with different intended uses for a property. Eminent domain law provides a ready answer to all three arguments.  The definition of fair market value, including the objective highest and best use standard, exists precisely to avoid the need for a subjective inquiry into the value any particular owner places on a property.  (*City of San Diego v. Neumann* (1993) 6 Cal.4th 738, 743–744.)  Valuing a property based on highest and best use does not compensate an owner for the value of a property in the future; the highest and best use is to be considered " 'to the extent that the probability of such a prospective use affects the market value.' "  (*Id.* at p. 744.)  Thus, valuing a property based on highest and best use compensates the owner only for the value of the property's potential, not as if the property had already been improved.  Also, defining the highest and best use as a use "to which the property might be put in the *reasonably near future*" (*ibid.*, italics added) grounds the inquiry and avoids the need to speculate about distant future development possibilities.  In short, if the highest and best use is sufficiently definite to make it just for a government entity to compensate a property owner for its loss, it is sufficiently definite to constitute a basis for determining the "actual loss" under a title insurance policy.

Commonwealth cites repeatedly to a treatise published by the American Land Title Association, the same entity that created the form of the Taits' title insurance policy.  (Nielsen, Title and Escrow Claims Guide (American Land Title Association 2024) Resolving Covered Claims.)  This treatise actually supports

19

the Taits. It states that in most respects "the method used for title insurance appraisals is the same as the method used in condemnation cases" because both determine the compensation to a property owner for a loss of property. (*Id.,* § 3.2.3.8 & fn. 167.) It further states, "Generally accepted appraisal standards require an appraiser to establish fair market value according to the property's highest and best use." (*Id.,* § 3.2.3.8.) That is precisely what we hold here. In the absence of any language in the policy to the contrary, the measure of a property owner's loss from a cloud on title is the diminution of a property's value caused by the title defect on the date the insured discovers it, measured according to the property's highest and best use.

## V. The Taits' evidence of value based on highest and best use

Commonwealth maintains that, regardless of whether the value of a property can be based on its highest and best use, the trial court properly granted summary judgment because the Taits did not provide competent evidence that subdivision into two separate parcels was the highest and best use of their property. Commonwealth's position is that the Valbridge appraisal's assumption that the property could be subdivided was speculative and contrary to the actual facts because the building restrictions and offer of dedication of a drainage easement precluded such subdivision.

The building restrictions and offer of dedication arise from documents recorded in the chain of title for the Taits' property, but it is undisputed that the town could eliminate them. They

20

are similar in this respect to zoning restrictions, which limit the development of property but, with some limitations, can be changed in various ways for any given property at a local government's discretion.  (See *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1006–1007 [property owners can seek relief from zoning restrictions via changes to zoning ordinances, conditional use permits, and variances].)  The principles of eminent domain law for evaluating how potential changes to zoning rules impact the value of a property therefore provide a useful analogy for evaluating whether the legal restrictions on the Taits' property precluded them from proving that subdivision was their property's highest and best use.

In condemnation proceedings, " '[w]here due to zoning restrictions the condemned property is not presently available for use to which it is otherwise geographically and economically adaptable, the condemnee is entitled to show a reasonable probability of a zoning change in the near future and thus to establish such use as the highest and best use of the property.' " (*Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.*, *supra*, 41 Cal.4th at p. 967.)  "Evidence of a reasonable probability of a zoning change in the near future ' "must at least be in accordance with the usual minimum evidentiary requirements, and that which is purely speculative, wholly guess work and conjectural, is inadmissible." ' [Citation.]  The evidence, if credited, must also be sufficient to establish that rezoning is reasonably probable.  [Citation.]  If the trial court

21

determines that no fact finder could find a reasonable probability of rezoning on the record presented, it may exclude all evidence and opinions of value based on a use other than that authorized by the existing zoning. If, on the other hand, the trial court determines that there is sufficient evidence of a reasonable probability of rezoning to warrant submitting the issue to the jury, it is for the jury, in considering the weight to be given valuation testimony based upon a reasonable probability of rezoning, to determine whether there was a reasonable probability of rezoning and, if so, its effect on the market value of the property." (*Id.* at p. 968.)

These eminent domain rules provide a framework for addressing Commonwealth's concerns about the restrictions on the property's highest and best use and the trial court's obligation to act as gatekeeper and exclude speculative expert opinion testimony. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772.) The trial court here never ruled on whether there was sufficient evidence of the probability of subdivision, but the Taits' evidence easily meets this standard. Over the course of nine months preceding the discovery of the maintenance easement, the Taits engaged in at least preliminary review talks with the town's staff about releasing the drainage easement and building restrictions and subdividing the property. The town's staff supported the Taits' plan. According to the testimony of the town's development services coordinator, Korbmacher, when staff supports a subdivision, it is "very, very rare" that the town's planning

commission and town council does not approve it. With this support, if the Taits had submitted an application, Korbmacher believed the town most likely would have approved the subdivision. The Taits were finalizing their application for a tentative subdivision map and it was ready for submission when they discovered the maintenance easement. This evidence was more than sufficient to allow a factfinder to find a reasonable probability that the Taits could subdivide their property within the reasonably foreseeable future, so the Taits should have been allowed to present their evidence on the question at a trial.

Noting that the policy excepted from coverage losses "resulting from" the building restrictions and offer of dedication, Commonwealth contends that the property must be valued "as insured" and faults the Valbridge appraisal for valuing the property as though it was not burdened by the restrictions. This argument misses the mark. The Taits are not seeking compensation for a loss of value *caused by* these restrictions, but rather compensation for a loss of value *despite* these restrictions. The policy exceptions define the scope of the insurer's risk; they do not define the value of the property. After all, the policy also excepts the deed of trust securing the Taits' mortgage, but Commonwealth does not contend the value of the property should be reduced by the face value of the deed of trust.

Commonwealth also emphasizes that the Taits never submitted a formal subdivision application or tentative map and the town never approved them, review of an application would take six to nine months, and staff support is not a guarantee that

23

an application will be approved. This evidence is not so strong as to preclude, as a matter of law, a finding of a reasonable probability that the building restrictions would be relaxed. At most, it demonstrates that there is a dispute of material fact about whether the Taits could achieve their proposed use of subdividing the property, so it does not support the trial court's summary judgment ruling.

Finally, Commonwealth urges us to disregard the Valbridge appraisal because it valued the property as if it had already been subdivided rather than as one property with the potential to be subdivided. We need not decide that issue because, even if we assume for purposes of argument that the Valbridge appraisal is flawed for valuing the property as two separate parcels instead of one, Commonwealth ignores entirely the first appraisal it obtained from AGI Valuations. In that first appraisal, AGI Valuations assumed that the building restrictions and offer of dedication of drainage easement would likely be extinguished to permit the subdivision but acknowledged that there were uncertainties about the likelihood of that happening. It then valued the property as a single parcel with the potential for subdivision and development of one portion and found the maintenance easement caused a $200,000 diminution in value. This, combined with the evidence of the likelihood of removal of the legal impediments to subdivision and development, was sufficient to create a triable issue of fact about whether Commonwealth's $43,500 payment to the Taits fully compensated

them for their "actual loss."  The trial court should not have granted Commonwealth's summary judgment motion.

## DISPOSITION

The judgment is reversed.


BROWN, P. J.


WE CONCUR:

GOLDMAN, J.
HITE, J.[*]


*Tait et al. v. Commonwealth Land Title Insurance Company* (A166676)

---

[*] Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial court: | Contra Costa County Superior Court |
| Trial judge: | Honorable Claire M. Maier |
| Counsel for plaintiffs and appellants: | NEWMEYER & DILLON LLP |
| | James J. Ficenec |
| Counsel for defendant and respondent: | GARRETT & TULLY P.C. |
| | Ryan C. Squire |
| | Candie Y. Chang |